UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| **TIFFANY DAVIS,** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **No. 1:15-cv-208** |
| | ) | **Chief Judge Crenshaw** |
| **VICKI FREEMAN, Warden,** | ) | |
| | ) | |
| **Respondent.** | ) | |

<u>**MEMORANDUM OPINION**</u>

Tiffany Davis, an inmate at the Tennessee Prison for Women, is serving a thirty-year sentence after being found guilty by a jury of the Marshall County (Tennessee) Circuit Court of the following crimes involving cocaine: four counts of sale, six counts of delivery, two counts of conspiracy to sell, and one count of the lesser included offense of facilitation of sale. (Doc. No. 38-2, PageID# 327–44; Doc. No. 38-17, PageID# 1447.) Davis initially filed this habeas corpus action pro se under 28 U.S.C. § 2254. (Doc. No. 1.) This Court appointed counsel for Davis and ordered the submission of an amended petition (Doc. No. 9), which counsel then filed (Doc. No. 16). Respondent has filed an answer to the petition (Doc. No. 40) along with the state court record (Doc. Nos. 38, 49). Davis has also filed a motion to amend her petition (Doc. No. 55) and a motion for discovery (Doc. No. 48). Respondent filed a response in opposition to Davis's motion for discovery (Doc. No. 52) to which Davis filed a reply (Doc. No. 56). Respondent concedes both that the Davis's petition was timely filed under 28 U.S.C. § 2254(d)(1) and that it is Davis's first application for federal habeas relief.[1] (Doc. No. 40, PageID# 1643.)

---

[1]     Respondent moved to dismiss Davis's petition as untimely (Doc. No. 27) but withdrew that motion upon discovering that it had incorrectly stated the filing date for the petitioner's prior state court habeas corpus petition. (Doc. No. 36, PageID# 185.)

Davis has requested that the Court "[h]old an evidentiary hearing on [her] claims" but she has not explained how such a hearing would help her develop those claims. (Doc. No. 16, PageID# 79.) This Court need not hold an evidentiary hearing where "the record refutes the applicant's factual allegations or otherwise precludes habeas relief." Schriro v. Landrigan, 550 U.S. 465, 474 (2007). The Court must consider Davis's claims in light of the "deferential standards prescribed by [the Antiterrorism and Effective Death Penalty Act (AEDPA)]," under which a state court's factual findings are presumed correct subject to rebuttal by clear and convincing evidence. Id.; 28 U.S.C. § 2254(e)(1). Having reviewed Davis's arguments and the underlying record, the Court finds that an evidentiary hearing is not required. Davis is not entitled to relief under AEDPA's standards. Her petition will be denied, as will the motion to amend (Doc. No. 55) and motion for discovery (Doc. No. 48). This case will be dismissed.

## I. Procedural History

Davis was prosecuted as a result of her connection to eight separate controlled cocaine purchases that were conducted using confidential informants. State v. Davis, No. M2010-01779-CCA-R3-CD, 2012 WL 1372078, at *1 (Tenn. Crim. App. Apr. 18, 2012) (Davis I); (Doc. No. 38-17, PageID# 1447). On November 18, 2009, the Marshall County Grand Jury indicted Davis, charging her with eight counts of the sale of cocaine, eight counts of delivery of cocaine, and two counts of conspiracy to sell cocaine. (Doc. No. 38-1, PageID# 195–214.) From April 12 to April 14, 2010, Davis was tried before a jury in the Marshall County Circuit Court (hereinafter, the trial court), which found her guilty of one count of sale of less than 0.5 grams of cocaine (a Class C felony), three counts of sale of 0.5 grams or more of cocaine (a Class B felony), three counts of delivery of less than 0.5 grams of cocaine (a Class C felony), three counts of delivery of 0.5 grams or more of cocaine (a Class B felony), two counts of conspiracy to sell 0.5 grams or more of

cocaine (a Class C felony), and one count of the lesser included offense of facilitation of the sale of 0.5 grams or more of cocaine (a Class C felony). Davis I, 2012 WL 1372078, at *1; (Doc. No. 38-2, PageID# 327–44). The jury found Davis not guilty of the remaining five counts. (Doc. No. 38-2, PageID# 330, 333, 335, 341, 343.) Davis was represented at trial by attorney Terry Hernando. (Doc. No. 1, PageID# 8.)

On June 2, 2010, the trial court held a sentencing hearing. Davis I, 2012 WL 1372078, at *2. The trial court merged alternative theories so that only one conviction remained from each criminal episode. Id. At the sentencing hearing, the State introduced Davis's seven prior Class B felony convictions, which enabled the trial court to find that Davis was a "career offender" and impose a sentence of fifteen years for each Class C felony and thirty years for each Class B felony, all to run concurrently. Id. However, because Davis was serving probation for a prior sixteen-year sentence at the time of the offenses relevant to this action, the trial court ordered that Davis's sentence run consecutive to that sentence. Id.

On July 8, 2010, Davis filed a motion for a new trial, arguing that the evidence presented was insufficient to sustain her convictions and that the trial court erred by ordering that her thirty-year sentence be consecutive to her prior sixteen-year sentence. (Doc. No. 38-3, PageID# 354.) The trial court denied that motion on July 29, 2010, and appointed Hernando to represent Davis on appeal. (Id. at PageID# 356.)

Davis filed her notice of appeal on August 19, 2010 (Doc. No. 38-2, PageID# 347), raising the same issues as in her motion for a new trial. (Doc. No. 38-14, PageID# 1339.) Specifically, she argued that the testimony of the confidential informant witnesses who helped conduct the controlled cocaine transactions was often the only evidence linking her to those transactions and that the testimony was so biased—as a result of deals the informants had struck with the police—

that a reasonable jury could not have believed it. (Id. at PageID# 1370–83.) Davis also argued that it was improper for the trial court to consider her prior criminal history in finding her to be a "career offender" and in sentencing her consecutively. (Id. at PageID# 1386.) On April 18, 2012, the Tennessee Court of Criminal Appeals (TCCA) affirmed the trial court's judgment, concluding that the jury's decision to credit the testimony of the informant witnesses was not improper and that there was sufficient evidence in the record to support Davis's convictions. Davis I, 2012 WL 1372078, at *1. The TCCA also held that it has repeatedly affirmed that a defendant's prior record may be considered both to determine the length of her sentence and to impose consecutive sentencing.[2] Id. at *20. The Tennessee Supreme Court denied permission to appeal on August 15, 2012. (Doc. No. 38-19.)

After losing her direct appeal, Davis made three further attempts to obtain relief from her conviction in state court. On October 29, 2012, Davis filed a petition for post-conviction relief in the trial court (Doc. No. 49-1), which she amended with appointed counsel James Frazier's aid (Doc. No. 49-2). In that petition, Davis argued that she was convicted by a biased jury and that her trial counsel was ineffective in the following ways: (1) counsel failed to strike Casey Davis (someone Davis knew) from the jury; (2) counsel failed to call Gail Davis as a witness; (3) counsel urged Davis's friends and family to encourage her to accept a plea offer and complained that the case was too difficult for him; (4) counsel failed to interview witnesses and failed to adequately prepare for trial; (5) counsel had a conflict of interest in that he had previously represented confidential informant Pamela Goetz in a previous case; and (6) counsel failed to sufficiently

---

[2]     The TCCA ruled on the merits of Davis's sufficiency of the evidence and excessive sentencing claims despite having found that Davis's motion for a new trial and her notice of appeal were untimely. The TCCA waived the notice of appeal deadline and ruled on Davis's claims because "sufficiency of the evidence and sentencing issues" need not be timely raised in a motion for new trial "in order to preserve appellate review." Davis I, 2012 WL 1372078, at *13.

cross-examine Goetz regarding her identification of Davis. (Id. at PageID# 1704–05.) In an order

issued on May 6, 2013, the trial court found that trial counsel's failure to challenge juror Corey

Davis, failure to call Gail Davis as a witness, and refusal to withdraw from representing Davis did

not amount to ineffective assistance of counsel; it did not reach Davis's other claims. (Doc. No.

49-4, PageID# 1709–10.)  Davis did not appeal that decision (Doc. No. 16, PageID# 67).

On December 31, 2013, Davis, proceeding pro se, initiated a state habeas petition in the

trial court in which she claimed that her sentence violated the Double Jeopardy Clause and again

argued that she was denied the effective assistance of counsel (although she did not specify on

what grounds). Tenn. Code Ann. § 29-21-101; (Doc. No. 38-13, PageID# 1292–95). The trial court

rejected those arguments, explaining that the merger of many of Davis's convictions resolved any

double jeopardy concerns and that ineffective assistance of counsel claims cannot be litigated in

state habeas corpus proceedings. (Doc. No. 38-20, PageID# 1573–76.) Davis pressed the same

arguments on appeal, clarifying that trial counsel had been ineffective by allowing her to be tried

on charges for which she was not indicted. (Id. at PageID# 1566.) The TCCA affirmed the trial

court, explaining that neither a violation of double jeopardy nor the Sixth Amendment right to

counsel provides a basis for state habeas relief. Davis v. Jones, No. M2014-00386-CCA-R3-HC,

2014 WL 3749443, at *2 (Tenn. Crim. App. July 30, 2014) (Davis II); (Doc. No. 38-22, PageID#

1607–09.)

Finally, again proceeding pro se, Davis filed a petition in the trial court for a writ of error

coram nobis on December 22, 2014, in which she argued that trial counsel was ineffective by

failing to adequately explain the charges that had been brought against her and again protested that

she had not been indicted on all charges. Tenn. Code Ann. § 27-7-101; (Doc. No. 34-1, PageID#

174–76). In an affidavit attached to her petition, Davis also averred that she was never arraigned.

(Doc. No. 49-6, PageID# 1714.) The trial court rejected Davis's petition on several grounds, finding that (1) Davis's petition was based on allegations that were either inaccurate or previously addressed, (2) none of Davis's allegations could constitute the "newly discovered evidence" that forms the basis of a viable coram nobis claim, and (3) her petition appeared to be time-barred. (Id. at PageID# 1716.) Davis did not appeal that decision. (Doc. No. 16, PageID# 68.)

Davis timely filed this federal action pro se on March 30, 2015. (Doc. No. 1.) The Court appointed counsel (Doc. No. 9), who filed an amended petition. (Doc. No. 16.) Respondent has filed an answer to the petition (Doc. No. 40) and the state court record (Doc. Nos. 38, 49). Davis has filed a motion to amend her petition (Doc. No. 55) and a motion for discovery (Doc. No. 48), which relate to her claim that the state withheld impeachment evidence pertaining to the confidential informants who testified against her at trial. Respondent filed a response in opposition to Davis's motion for discovery (Doc. No. 52), to which Davis filed a reply (Doc. No. 56).

## II.    Statement of Facts

The TCCA, which heard and rejected Davis's challenges to her convictions on direct appeal, provided the following description of the evidence presented at Davis's trial:

### I.

Counts 1 and 2 arose out of a controlled drug purchase at the Defendant's residence at the Martin Street Apartments in Marshall County at approximately 8:00—8:30 p.m. on August 6, 2008. The Defendant was indicted for the sale (Count 1) and delivery (Count 2) of less than 0.5 grams of cocaine, both Class C felonies.

Christine Guerrero ("CI Guerrero") testified that she was working for the DTF as a confidential informant for the first time on August 6, 2008. She admitted that she had used drugs on "numerous occasions" and had multiple prior convictions for forgery, fraudulent use of a debit card, and theft. CI Guerrero testified that she was "friends" with the Defendant and was familiar with her prior to the controlled buy. CI Guerrero said that she bought crack cocaine from the Defendant on numerous occasions and, in fact, would buy crack cocaine from the Defendant every day that she could afford to do so.

On August 6, CI Guerrero called the Defendant's cell phone to see if she could buy $60 worth of crack cocaine, and according to CI Guerrero, the Defendant told her to come to the Defendant's apartment. The Defendant requested that CI Guerrero purchase a two-liter bottle of Mountain Dew out of the $60 and deliver it to her. CI Guerrero subsequently contacted DTF agents and informed them that she could purchase crack cocaine from the Defendant.

CI Guerrero then met with DTF Assistant Director Tim Miller and Agent Bart Fagan near a local bowling alley. Assistant Director Miller searched the Defendant to verify that she was not carrying any contraband such as drugs or money. He also outfitted her with an audio recording device and gave her $57.86 and a two-liter bottle of soda. CI Guerrero then drove to the Defendant's home in a DTF-provided vehicle, which had also been searched for contraband. DTF agents followed in a separate unmarked vehicle, maintaining constant surveillance of CI Guerrero. Assistant Director Miller set up a surveillance position from which he could see the Defendant's apartment. He testified that he never lost sight of CI Guerrero and watched through binoculars as she entered the Defendant's apartment. As CI Guerrero entered the apartment, Assistant Director Miller saw the Defendant stick her head out of the door and look around.

CI Guerrero testified that only the Defendant and her two minor daughters were inside the apartment and that she did not see any other adults. She testified that she gave the Defendant $57 and that the Defendant told her to keep the $.86 cents; one of the Defendant's daughters retrieved the bottle of soda from CI Guerrero's vehicle.

CI Guerrero said that the Defendant handed her a yellow napkin containing crack cocaine. CI Guerrero left the Defendant's house, got into her vehicle, and returned to the bowling alley. Assistant Director Miller kept constant surveillance during the return trip. At the bowling alley, CI Guerrero handed Assistant Director Miller the napkin containing the suspected narcotics and the unspent $.86 cents. She also returned the audio recorder. The recording of the transaction was admitted into evidence.

Assistant Director Miller searched CI Guerrero again for contraband. He testified that he maintained control of the substance in the yellow napkin until relinquishing it to DTF Director Tim Lane. Lane served as the agency's evidence custodian and, in that role, escorted suspected narcotics to and from the Tennessee Bureau of Investigation ("TBI") laboratory for testing. A TBI lab technician testified that the substance tested positive for cocaine base and weighed 0.3 grams.

The Defendant testified that she recognized CI Guerrero but did not know her. She said that she recognized CI Guerrero from jail and as a friend of the Defendant's neighbor, but denied having a conversation with her. The Defendant denied that CI Guerrero called her cell phone on August 6, 2008, and denied selling CI Guerrero

crack cocaine on that date. The Defendant stated that it was not her voice on the audio recording.

The jury convicted the Defendant for the sale (Count 1) and delivery (Count 2) of less than 0.5 grams of cocaine, both Class C felonies.

## II.

Counts 3, 4, and 5 arose out of a controlled drug purchase occurring in the parking lot of a Kroger grocery store in Marshall County between 7:00 and 8:00 p.m. on October 22, 2008. The Defendant was indicted for the sale (Count 3), delivery (Count 4), and conspiracy to sell (Count 5) 0.5 grams or more of cocaine.

Pamela Goetz ("CI Goetz") testified that she was working with the DTF as a confidential informant on October 22, 2008. CI Goetz testified that she was a frequent crack cocaine user and that she had worked with the DTF for approximately four years. She said that, on the day of the controlled buy, she did not know the Defendant very well, having only seen her a few times, but that she did recognize the Defendant. She said that she met the Defendant through her friendship with co-defendant Ward.

CI Goetz stated that on October 22 she called the Defendant's cell phone to arrange to purchase crack cocaine later that day. She met with DTF agents at the local industrial park where she called the Defendant's cell phone again. CI Goetz arranged with the person on the other end of this phone call to meet at Kroger to purchase $80 worth of crack cocaine. This phone call was recorded and played for the jury; however, due to a technical error, only CI Goetz's end of the conversation was audible on the recording.

CI Goetz's testimony regarding Counts 3, 4, and 5 spanned two days at trial, and the testimony was sometimes inconsistent. During a recess on the first day of CI Goetz's testimony, she apparently told the prosecutor that she was nervous due to threats made against her minor daughter while the daughter was at school. The prosecutor requested a jury-out hearing during which he informed the trial court of these circumstances. At the State's unopposed request, the trial court adjourned for the evening. The next day, CI Goetz again took the witness stand. She testified that her daughter had been threatened at school by a fellow student that her mother had "better not testify." CI Goetz relayed that the person making the threat was not a member of the Defendant's family and that she did not believe the Defendant was behind the threat. She then testified a second time regarding the controlled buy on October 22, 2008.

CI Goetz thus essentially testified twice regarding the controlled buy on October 22, 2008. She was cross-examined about the differences in her testimony between the two days and the reasons for these differences. She stated that her testimony differed because on the first day she was "confused," "nervous," and "worried

about [her] child." She said that once she knew her daughter was safe she was able to testify truthfully.

On the first day of her testimony, CI Goetz said that she was generally not able to recognize the Defendant's voice and confused the Defendant's voice with Ward's. She also initially testified that it was Ward with whom she spoke on the phone call made from the industrial park in which she arranged to meet at Kroger to purchase $80 worth of crack cocaine. However, on the second day of her testimony, she recanted her prior testimony and affirmatively stated that it was the Defendant, not Ward, with whom she spoke on the phone call from the industrial park.

Following the phone call from the industrial park, Agent Chad Webster and CI Goetz drove to Kroger expecting to meet the Defendant. When they arrived, the Defendant was not present. CI Goetz testified that "I called and [the Defendant] said she is on her way. That she is in Kroger's [*sic* ]." This phone call was recorded and played for the jury; however, only CI Goetz's side of the conversation was audible. On the second day of her testimony, CI Goetz clarified that during this phone call, the Defendant told her that Ward would be meeting her to deliver the crack cocaine and that Ward was inside the store.

CI Goetz testified that she and Agent Webster went inside the store looking for Ward. A short time later, Ward called and said that she was pulling into the parking lot. CI Goetz and Agent Webster left the store. Agent Webster returned to his vehicle, and CI Goetz stood beside Agent Webster's vehicle as Ward arrived in a white Oldsmobile Cutlass. CI Goetz knew the Cutlass to be the Defendant's vehicle. Ward parked next to Agent Webster's vehicle, and CI Goetz approached Ward. Ward handed CI Goetz a plastic bag containing crack cocaine, and CI Goetz handed Ward $80. CI Goetz stated that she and Ward did not have to discuss the price or amount for the drugs because "[s]he knew what I wanted." CI Goetz then returned to Agent Webster's vehicle and handed him the suspected drugs. Agent Webster testified that the two vehicles were parked near each other and that he could visually identify Ward. CI Goetz and Agent Webster left the parking lot and returned to the industrial park. There, agents again searched her for contraband. DTF agents Billy Ostermann and Shane George followed Ward as she left Kroger and returned to the Defendant's residence at the Martin Street Apartments.

CI Goetz testified that a few minutes after the transaction, the Defendant called her to confirm whether she had made contact with Ward. Agent Webster testified that he was unable to listen to this phone call but that after the call ended, he checked CI Goetz's phone and verified that the calling number was the Defendant's cell phone number. Later, at the industrial park, CI Goetz received another phone call from the Defendant in which the Defendant told CI Goetz that "[s]he was leaving town and wanted to know if I needed any more [crack cocaine]." Agent George overheard both sides of this phone call, but it was not recorded. Audio and video recordings of the transaction in the Kroger parking lot between Ward and CI Goetz were admitted as exhibits.

Agent Webster's testimony corroborated CI Goetz's second day of testimony. He stated that he never heard the Defendant's voice on the phone calls, only CI Goetz's. He confirmed that he did not see the Defendant in the car with Ward. He testified that he gave the suspected narcotics to Director Lane, who delivered them to the TBI lab. A TBI lab technician testified that the substance tested positive for cocaine base and weighed 0.5 grams.

The Defendant testified that she did not know CI Goetz and that she never agreed to sell her crack cocaine. She denied selling CI Goetz crack cocaine on October 22, 2008, and denied sending Ward to sell her crack cocaine. She denied talking to CI Goetz over the telephone on that date. She testified that she shared her cell phone with her boyfriend, Kenneth Jackson, and Ward. She said that Jackson and Ward often borrowed her car and that Ward must have done so on the date in question.

The jury found the Defendant guilty of the sale (Count 3) and conspiracy to sell (Count 5) 0.5 grams or more of cocaine, Class B and C felonies, respectively. She was acquitted of the delivery charge (Count 4).

### III.

Counts 6, 7, and 8 arose out of a controlled drug purchase at a Food Lion grocery store in Marshall County at approximately 7:30 p.m. on October 29, 2008. The Defendant was indicted for the sale (Count 6), delivery (Count 7), and conspiracy to sell (Count 8) 0.5 grams or more of cocaine.

CI Goetz testified that on October 29, 2008, she called the Defendant's cell phone to arrange to purchase $80 worth of crack cocaine. With the deal arranged, she met with DTF agents at the industrial park around 6:30 p.m. and again called the Defendant's cell phone. The Defendant answered and told CI Goetz that she was getting something to eat and instructed CI Goetz to call again in an hour. An audio tape of this telephone call was played for the jury; however, again, the recording only contained CI Goetz's side of the conversation. After unsuccessfully attempting to contact the Defendant a few times, CI Goetz finally reached the Defendant on her cell phone and again requested to buy $80 worth of crack cocaine. The Defendant told CI Goetz to meet her at the Food Lion in twenty minutes. This phone call was also recorded from CI Goetz's end of the conversation, and the recording was played for the jury.

At the industrial park, CI Goetz was searched for contraband, issued $80 in DTF funds, and outfitted with an audio recording device. Agent Webster drove CI Goetz from the industrial park to the Food Lion in his DTF vehicle. He testified that he maintained constant visual observation of CI Goetz throughout the entire drug transaction. Once at the Food Lion, CI Goetz called the Defendant, who said that she "was already there" in a silver car. CI Goetz visually identified the Defendant sitting in the front passenger seat of a silver Buick that was parked behind Agent

Webster's vehicle. CI Goetz also saw a man sitting in the vehicle but could not identify him. Ward exited the silver Buick and approached Agent Webster's vehicle. CI Goetz exited Agent Webster's vehicle and met Ward beside Agent Webster's vehicle. According to CI Goetz, Ward was "real paranoid" about a nearby vehicle with a man sitting in it who Ward thought was watching them. As Ward approached, she told CI Goetz to give her a hug, and, during the hug, Ward took the $80 from CI Goetz and gave CI Goetz two loose rock-like substances. Ward told her that "if you drop one of them, you are on your own." Agent Webster testified that the transaction occurred directly beside his DTF vehicle, and he positively identified Ward but did not see the Defendant in the silver Buick. CI Goetz returned to Agent Webster's vehicle and gave him the suspected narcotics. Agent Webster subsequently searched CI Goetz for contraband. She returned the audio recorder, and the transaction recording was played for the jury.

Agent George, who had been conducting surveillance of the transaction, followed the silver Buick as it left the Food Lion parking lot. According to Agent George, the silver Buick returned to the Martin Street Apartments and parked in front of apartment 200, which he knew to be the Defendant's apartment. Agent George testified that from his vantage point, he "could see the silhouette of what I believed to be a black female standing at the driver's side door of the vehicle," and he could also see two other occupants of the vehicle, but he could not positively identify anyone. Agent George ran the tags to the silver Buick and determined that it was registered to a person named Lakeisha Perkins.

Agent Webster delivered the suspected drugs to Director Lane, who delivered them to the TBI laboratory. A TBI lab technician testified that the rock-like substances tested positive for cocaine base and weighed 0.7 grams.

The Defendant testified that she did not speak to CI Goetz by phone on October 29, 2008. She denied agreeing with Ward to sell crack cocaine to CI Goetz on that date. She denied ever agreeing with Ward to sell crack cocaine to anyone. She denied being inside the car at the Food Lion parking lot on that date.

The jury found the Defendant guilty in Count 6 of the lesser included offense of facilitation of the sale of 0.5 grams or more of cocaine, a Class C felony, and also found her guilty in Count 8 of conspiracy to sell 0.5 grams or more of cocaine, a Class C felony. The jury acquitted her of the delivery charge in Count 7.

## IV.

Counts 9 and 10 arose out of a controlled drug purchase occurring on October 31, 2008, at approximately 3:30—4:30 p.m. in the parking lot of a Krystal restaurant in Marshall County. The Defendant was indicted for the sale (Count 9) and delivery (Count 10) of 0.5 grams or more of cocaine.

CI Goetz testified that earlier in the afternoon of October 31, 2008, she talked to the Defendant on the telephone to see if she could purchase crack cocaine later that day. CI Goetz subsequently met with DTF agents at the industrial park where she called the Defendant again to arrange the specific details of the drug transaction. This time, Ward answered the phone. CI Goetz arranged with Ward to purchase $80 worth of crack cocaine. Ward later called back, and the two women arranged to meet at Krystal. Only the audio from CI Goetz's end of these two phone calls was recorded. The recording was played for the jury. DTF agents searched CI Goetz for contraband and provided her with an audio recording device. Agent Webster drove CI Goetz to Krystal's parking lot. Agents George and Ostermann set up a surveillance position in the parking lot and videotaped the transaction.

The Defendant and Ward arrived in a white Oldsmobile Cutlass registered to the Defendant. They parked directly beside Agent Webster's vehicle. CI Goetz exited Agent Webster's vehicle and walked towards the Defendant's vehicle. According to both CI Goetz and Agent Webster, the Defendant was sitting in the front passenger seat and Ward was sitting in the driver's seat.[1] CI Goetz approached the passenger's side of the vehicle first, but the Defendant motioned for CI Goetz to go to the driver's side of the vehicle. CI Goetz did so and stood beside the driver's side door. According to CI Goetz, the Defendant handed Ward crack cocaine wrapped in white paper, which Ward then handed to CI Goetz. In exchange, CI Goetz handed Ward $80, and Ward handed the money to the Defendant. Agent Webster, sitting in his vehicle directly beside the Defendant's vehicle, corroborated the testimony of CI Goetz. The audio and video recordings of the transaction were admitted as exhibits.

Agent Webster testified that CI Goetz then returned to his vehicle and handed him a piece of paper containing a rock-like substance. Agents searched CI Goetz for contraband. Agent Webster turned over the suspected narcotics to Agent George, who delivered them to Director Lane. A TBI lab technician testified that the rock-like substance contained in the white paper tested positive for cocaine base and weighed 0.5 grams.

The Defendant testified that she did not speak with CI Goetz on October 31, 2008. She denied being present at that Krystal on that date. She denied selling crack cocaine to CI Goetz and said that CI Goetz was lying. She denied that she was depicted in the video recording.

The jury found the Defendant not guilty of the sale (Count 9) but guilty of the delivery (Count 10) of 0.5 grams or more of cocaine, a Class B felony.

## V.

Counts 11 and 12 arose out of a controlled drug purchase occurring at a BP gas station in Marshall County at approximately 8:00 p.m. on November 4, 2008. The

Defendant was indicted for the sale (Count 11) and delivery (Count 12) of 0.5 grams or more of cocaine, both Class B felonies.

CI Goetz testified that she called the Defendant to confirm that she would be able to buy $140 worth of crack cocaine later that day. CI Goetz then notified DTF agents and met them at the industrial park, where she called the Defendant a second time and arranged the specifics of the transaction. In this conversation, CI Goetz and the Defendant agreed to meet at a local BP gas station. This second phone call was recorded and played for the jury. Both sides of the phone conversation on the recording were audible but distorted.

DTF agents searched CI Goetz for contraband and provided her with an audio recording device. Agent Webster then drove CI Goetz to the BP gas station in his DTF vehicle. A short time later, the Defendant and Ward arrived in the silver Buick registered to Perkins. Ward was driving, and the Defendant was in the front passenger seat. CI Goetz exited the DTF vehicle and entered the rear driver's side door of the Buick. CI Goetz testified that when the Defendant went to hand her a clear plastic bag with drugs in it, Ward "grabbed the bag of dope" out of the Defendant's hand. Ward then told CI Goetz that, "If it wasn't for me, you wouldn't be getting no dope." Ward then "took a piece of [the] dope out" and "handed [CI Goetz] the package." CI Goetz handed the Defendant $140 and returned to the DTF vehicle.

After leaving the silver Buick and returning to Agent Webster's vehicle, CI Goetz gave him the plastic bag containing suspected crack cocaine and the recording devices. They returned to the industrial park, where agents again searched CI Goetz for contraband. Agent Webster delivered the suspected narcotics to Director Lane, who delivered them to the TBI laboratory. A TBI lab technician testified that the substance tested positive for cocaine base and weighed 0.8 grams.

Agent George videotaped the transaction from a surveillance position. Both the audio and video recordings were admitted as exhibits. On cross-examination, Agent Webster admitted that he did not actually see the Defendant during the transaction. CI Goetz also admitted that the Defendant was not visible on the video; however, she maintained that the Defendant was in the car.

The Defendant testified that she was not at the BP gas station during the transaction. She denied handing CI Goetz illegal drugs or receiving money from her. She denied speaking to CI Goetz on that date.

The jury found the Defendant guilty of the sale (Count 11) and delivery (Count 12) of 0.5 grams or more of cocaine, both Class B felonies.

**VI.**

Counts 13 and 14 arose out of a controlled drug purchase occurring at a liquor store in Marshall County at approximately 5:00 p.m. on December 2, 2008. The Defendant was indicted for the sale (Count 13) and delivery (Count 14) of 0.5 grams or more of cocaine, both Class B felonies.

CI Goetz testified that she called the Defendant's cell phone earlier in the day to arrange to purchase crack cocaine. CI Goetz subsequently met with DTF agents at the industrial park. From there, she called the Defendant's cell phone again and arranged to meet the Defendant at the East Side Liquor Store to purchase $180 worth of crack cocaine. An audio recording of this phone call was made and played for the jury. Both sides of the phone conversation were audible, and CI Goetz identified the Defendant's voice on the recording. DTF agents searched CI Goetz for contraband and provided her with an audio recording device.

Agent Webster drove CI Goetz to the liquor store, and as they pulled in, the Defendant arrived in a white Oldsmobile Cutlass. The two cars were parked a few parking spaces away from each other, with the driver's side of Agent Webster's vehicle facing the passenger's side of the Defendant's vehicle. CI Goetz exited Agent Webster's vehicle and entered the back seat of the Defendant's vehicle. CI Goetz testified that a black male, whom she identified as Kenneth Jackson, was in the driver's seat of the Defendant's vehicle and that the Defendant was in the front passenger seat. Ward was not present. According to CI Goetz, the Defendant asked her to go into the store and buy beer, which she did. After CI Goetz returned with beer and re-entered the Defendant's car, the Defendant told CI Goetz that there was a Newport cigarette box in the back seat. CI Goetz testified that when she picked up the box she discovered that it contained "a bag of dope." CI Goetz testified that she handed the Defendant $180 and left.

CI Goetz returned to Agent Webster's vehicle and handed him the cigarette box and audio recorders. Agent Webster subsequently searched her for contraband. Agent Webster turned over the suspected cocaine to Director Lane, who delivered it to the TBI laboratory. A TBI lab technician testified that the substance tested positive for cocaine base and weighed 1.4 grams.

Agent Webster testified that he visually identified both the Defendant and Jackson as the occupants of the Oldsmobile Cutlass. He testified that he maintained constant visual contact on CI Goetz except when she went into the store to purchase beer for the Defendant. Agent George conducted video surveillance of this transaction, and the video was played for the jury. Additionally, the audio recording of the transaction was played for the jury.

The Defendant denied talking to CI Goetz and denied being present at the liquor store at the time the transaction occurred.

The jury found the Defendant guilty of the sale (Count 13) and delivery (Count 14) of 0.5 grams or more of cocaine, both Class B felonies.

## VII.

Counts 15 and 16 arose out of a controlled drug purchase occurring at approximately 11:30 a.m. on February 11, 2009, at the Defendant's residence. The Defendant was indicted for the sale (Count 15) and delivery (Count 16) of less than 0.5 grams of cocaine.

Fredia Johnson ("CI Johnson") testified that, on February 11, 2009, she was working with the DTF as a confidential informant and was being paid for her services. CI Johnson had known the Defendant for "two or three" months, encompassing approximately five meetings. She said that she came to know the Defendant through Ward. CI Johnson admitted that she had a criminal record, including four prior convictions for forgery and a felony drug case pending in Bedford County.

CI Johnson testified that as of February 11, 2009, the Defendant had moved from the Martin Street Apartments and was living at 614 7th Avenue North, in Marshall County. CI Johnson testified that when she first called the Defendant's cell phone Kenneth Jackson answered the phone. CI Johnson spoke with Jackson about purchasing $100 worth of crack cocaine from the Defendant. CI Johnson then met with DTF agents at the industrial park, where she called the Defendant's cell phone in their presence. This latter call was recorded and the recording was admitted into evidence. During the call, the Defendant agreed to sell $100 worth of crack cocaine to CI Johnson.

Agent George testified that he recorded the serial numbers from each of five twenty-dollar bills given to CI Johnson as "buy money." CI Johnson then drove her personal vehicle, which had been searched for contraband, to the Defendant's home, while DTF agents maintained constant surveillance on her. She parked in the Defendant's driveway, got out of her vehicle, and knocked on the side door. The Defendant asked who was there, and CI Johnson replied "[i]t's Fredia." The Defendant opened the door, and CI Johnson went inside. CI Johnson testified that once inside the home, the Defendant handed her a "folded up piece of paper with crack cocaine in it and I hand[ed] her the $100." CI Johnson testified that no one else was present in the room when the drug transaction occurred, although she could hear Jackson's voice from the kitchen. CI Johnson had been outfitted with an audio recorder, and the recording of the transaction was played for the jury.

CI Johnson left the Defendant's residence and returned to the industrial park. DTF agents followed her there while maintaining constant surveillance. CI Johnson gave the folded up piece of paper with suspected cocaine in it to Agent George. Agent George later gave it to Director Lane, who delivered it to the TBI laboratory for testing. A TBI lab technician testified that the substance tested positive for cocaine base and weighed 0.3 grams.

Assistant Director Miller testified that he conducted video surveillance of the transaction from a nearby yard. The video was played for the jury. The video did not show the drug transaction, which took place inside the Defendant's home, but showed CI Johnson arriving and leaving from the residence. Assistant Director Miller testified that after CI Johnson and the other DTF agents left to return to the staging location, he remained at the scene. He said that soon after CI Johnson left the Defendant's residence, he saw Perkins arrive in a silver Buick and saw persons whom he believed to be the Defendant and Jackson get into the vehicle and leave. Assistant Director Miller then stopped the car based upon a felony warrant he had acquired for the Defendant. DTF agents recovered from the Defendant the five marked $20 bills that had been given to CI Johnson. They also recovered from the Defendant a cell phone with a phone number matching the one used in each prior controlled buy.

The Defendant denied knowing CI Johnson or ever speaking to her. The Defendant said that while CI Johnson may have called the cell phone that the Defendant shared with Jackson and Ward, the Defendant never spoke to her. The Defendant claimed that she was in Columbia, Tennessee at the time she allegedly sold drugs to CI Johnson. She said that when she was pulled over, Jackson had the cell phone and money on his person. According to the Defendant, Jackson thought he had an outstanding warrant and handed her the money and phone in the event he was arrested.

The jury found the Defendant not guilty of the sale (Count 15) but guilty of delivery (Count 16) of less than 0.5 grams of cocaine, a Class C felony.

## VIII.

Counts 17 and 18 arose out of a controlled drug purchase occurring at the Defendant's home at approximately 9:15 p.m. on February 19, 2009. The Defendant was indicted for the sale (Count 17) and delivery (Count 18) of less than 0.5 grams of cocaine.

On February 19, 2009, the Defendant, having bonded out of jail, was residing at 614 7th Avenue North in Marshall County. CI Johnson testified that she called the Defendant's cell phone to confirm that she could purchase $100 worth of crack cocaine later that day. CI Johnson reached the Defendant by calling a different cell phone number than the one that DTF agents confiscated on February 11, 2009.

CI Johnson and the Defendant apparently had some difficulty arranging a meeting location. After a series of proposed locations and aborted attempts, the two finally arranged via cell phone to meet at the Defendant's home. DTF agents searched CI Johnson for contraband and outfitted her with an audio recording device prior to her meeting the Defendant. Agents Webster and Ostermann followed CI Johnson to the Defendant's home and set up a surveillance position. They saw CI Johnson enter the Defendant's home. CI Johnson testified that after she entered the home,

the Defendant handed her crack cocaine wrapped in a folded piece of paper, and she handed the Defendant $100. An audio recording of the transaction was played for the jury, as well as audio recordings of the series of phone conversations in which CI Johnson and the Defendant attempted to arrange a meeting location.

CI Johnson left the Defendant's home under constant police surveillance and returned to the industrial park. She gave Agent Webster the folded piece of paper containing suspected narcotics. Agent Webster testified that he delivered the suspected drugs to Director Lane, who delivered them to the TBI laboratory. A TBI lab technician testified that the substance tested positive for cocaine base and weighed 0.4 grams.

The Defendant denied ever speaking to CI Johnson. She could not recall whether she was home at the time the transaction allegedly occurred, but denied selling CI Johnson crack cocaine. She said that the telephone number CI Johnson claimed to have dialed belonged to Perkins.

The jury found the Defendant not guilty of the sale (Count 17) but guilty of delivery (Count 18) of less than 0.5 grams of cocaine, a Class C felony.

Davis I, 2012 WL 1372078, at *2–11.

## III.    Issues Presented for Review

Davis's amended petition raises the following claims:

(1)    Ineffective assistance of trial counsel based on:

    (a)    failure to "adequately investigate each of the charged drug transactions" and failure to locate and present testimony from witnesses suggested by Davis, depriving her of an alibi "for at least some of the charged conduct," an opportunity to dissociate herself from the "car used in certain transactions," and a better-supported defense theory (namely, that "Serena Ward and/or Kenneth Jackson were solely responsible for the charged transactions") (Doc. No. 16, PageID# 73);

    (b)    "fail[ure] to withdraw from representing Ms. Davis despite a conflict of interest based on [trial counsel's] prior representation of prosecution witness Pam Goetz's minor child" (id.);

    (c)    failure to adequately cross-examine the State's confidential informant witnesses (id. at PageID# 73–74);

    (d)    failure to object to leading questions "that amounted to testimony by the prosecutor" (id. at PageID# 74);

(e)        failure to object to hearsay testimony (id.);

(f)        failure to object to Goetz's "prejudicial testimony about purported threats against her daughter stemming from Goetz's work as an informant against Ms. Davis" (id.);

(g)        failure to "challenge for cause or peremptorily strike juror Corey Davis"—someone Davis had used drugs with in the past (id.);

(h)        failure to object to the "jury instruction on criminal responsibility, which violated due process of law . . . by relieving the prosecution of its burden of proving all of the elements of the offense(s) beyond a reasonable doubt" (id.);

(i)        failure to object to the jury instruction "on 'knowing' and 'intentional' that allowed the jury to convict Ms. Davis based merely upon her alleged awareness of the charged conduct without finding that Davis had a conscious objective or desire to cause the result of a sale or delivery of cocaine" (id. at PageID# 74–75);

(j)        failure to adequately advise Davis regarding the State's plea offers, which caused her to reject offers that she might otherwise have accepted (id. at PageID# 75);

(k)        failure to subject the State's case to "meaningful adversarial testing" (id.); and

(l)        failure to object to Davis's arrest without probable cause, denial of a preliminary hearing, or the trial court's failure to conduct an arraignment.[3] (Id. at PageID# 78.)

(2)      Withholding of impeachment evidence in violation of Brady v. Maryland, 373 U.S. 83 (1963) and Giglio v. United States, 405 U.S. 150 (1972) (Doc. No. 16, PageID# 75–76);

(3)      Improper jury instructions that did not require the prosecution to prove guilt beyond a reasonable doubt (Doc. No. 16, PageID# 76–77);

(4)      Insufficient evidence to support her convictions (id. at PageID# 77–78); and

---

[3]      This claim of ineffective assistance is presented in connection with Davis's claim that her arrest without probable cause, detention without a preliminary hearing, and conviction without arraignment entitle her to habeas relief.

(5)     Arrest without probable cause, subsequent detention without a preliminary hearing, and conviction without proper arraignment in violation of the Due Process Clause and the Fourth Amendment (id. at PageID# 78).

The amended petition also incorporates all claims made by Davis in her pro se filing. (Id. at PageID# 68.)

## IV.     Legal Standard

Davis's petition is governed by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214. AEDPA "dictates a highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." Bell v. Cone, 543 U.S. 447, 455 (2005) (internal citations and quotations omitted); see also Hardy v. Cross, 565 U.S. 65, 66 (2011); Felkner v. Jackson, 562 U.S. 594, 597 (2011). AEDPA "requires heightened respect for state court factual and legal determinations." Lundgren v. Mitchell, 440 F.3d 754, 762 (6th Cir. 2006) (quoting Herbert v. Billy, 160 F.3d 1131, 1134 (6th Cir. 1998). "State-court factual findings . . . are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing' evidence." Davis v. Ayala, 135 S. Ct. 2187, 2199–2200 (2015) (quoting Rice v. Collins, 546 U.S. 333, 338–39 (2006)); 28 U.S.C. § 2254(e)(1).

The AEDPA standard is difficult to meet "because it was meant to be." Harrington v. Richter, 562 U.S. 86, 102 (2011); see also Burt v. Titlow, 571 U.S. 12, 16 (2013); Metrish v. Lancaster, 569 U.S. 351, 357–58 (2013); Cullen v. Pinholster, 563 U.S. 170, 181 (2011). The statute enforces the principle that "habeas corpus is a 'guard against extreme malfunctions in the state criminal justice systems,' not a substitute for ordinary error correction through appeal." Harrington, 563 U.S. at 102–03 (quoting Jackson v. Virginia, 443 U.S. 307, 332 n.5 (1979) (Stevens, J., concurring); see also Woods v. Donald, 125 S. Ct. 1372, 1376 (2015). AEDPA prevents federal "retrials" of matters decided by the state court and "ensure[s] that state-court

convictions are given effect to the extent possible under law." Bell v. Cone, 535 U.S. 685, 693 (2002) (Bell II). Under its provisions, petitioners may not "us[e] federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts." Parker v. Matthews, 567 U.S. 37, 38 (2012); see also White v. Wheeler, 136 S. Ct. 456, 460 (2015) (explaining that the Supreme Court, "time and again, has instructed that AEDPA, by setting forth necessary predicates before state-court judgments may be set aside, 'erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court'") (quoting Burt, 571 U.S. at 16).

The statute provides for the review of state court decisions in § 2254(d), which states:

An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—

(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in United States Supreme Court decisions or if it decides a case differently than the United States Supreme Court has done on a set of materially indistinguishable facts. Bell II, 535 U.S. at 694 (citing Williams v. Taylor, 529 U.S. 362, 405–06 (2000)). In determining whether federal law is clearly established, this Court may not rely on the decisions of lower federal courts. Lopez v. Smith, 135 S. Ct. 1, 4 (2014); Harris v. Stovall, 212 F.3d 940, 943–44 (6th Cir. 2000). AEDPA limits the source of law applied in determining whether a state court decision is "contrary to" clearly established federal law to the

holdings, not dicta, of cases decided by the United States Supreme Court. Williams, 529 U.S. at 412; Bailey v. Mitchell, 271 F.3d 652, 655 (6th Cir. 2001). Moreover, "clearly established Federal law" under AEDPA does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court. Greene v. Fisher, 565 U.S. 34, 38 (2011). Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Tennessee state courts in light of Supreme Court precedent at the time of the state court's adjudication on the merits. Miller v. Stovall, 742 F.3d 642, 644–45 (6th Cir. 2014) (citing Green, 565 U.S. at 38).

The Court may grant relief under the "unreasonable application" clause "if the state court identifies the correct governing legal rule from [United States Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case." Williams, 529 U.S. at 407. A federal habeas court may not find a state court adjudication to be unreasonable "simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411; accord Bell II, 535 U.S. at 699. Rather, the issue is whether the state court's application of clearly established federal law is "objectively unreasonable." Williams, 529 U.S. at 409. "[R]elief is available under § 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no 'fairminded disagreement' on the question." White v. Woodall, 134 S. Ct. 1697, 1706–07 (2014) (quoting Harrington, 562 U.S. at 103).

AEDPA also imposes a total exhaustion requirement, contained in 28 U.S.C. § 2254(b) and (c), which directs that "[a]n application for a writ of habeas corpus . . . shall not be granted unless it appears that . . . the applicant has exhausted the remedies available in the courts of the State" or such remedies are no longer available. Rhines v. Weber, 544 U.S. 269, 274 (2005). With certain

limited exceptions, to properly exhaust a claim under AEDPA, the petitioner must have raised the same claim on the same grounds before the state courts. Pinholster, 563 U.S. at 182; Kelly v. Lazaroff, 846 F.3d 819, 828 (6th Cir. 2017) (quoting Wagner v. Smith, 581 F.3d 410, 417) (6th Cir. 2009)) (petitioner must present the "same claim under the same theory" to the state court). "Because the exhaustion doctrine is designed to give the state courts a full and fair opportunity to resolve federal constitutional claims before those claims are presented to the federal courts . . . state prisoners must give the state courts one full opportunity to resolve any constitutional issues by invoking one complete round of the State's established appellate review process." O'Sullivan v. Boerckel, 526 U.S. 838, 845 (1999); see also Lyons v. Stovall, 188 F.3d 327, 331 (6th Cir. 1999). In Tennessee courts, a petitioner has exhausted all available state remedies when the TCCA has denied a claim of error. Adams v. Holland, 330 F.3d 398, 401 (6th Cir. 2003) (citing Tenn. Sup. Ct. R. 39).

"[A] habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance." Coleman v. Thomas, 501 U.S. 722, 732 (1991). If the claims can no longer be considered by the state court because they are procedurally barred under state law, they are considered defaulted for purposes of federal review. A petitioner must "demonstrate cause for his state-court default of any federal claim, and prejudice therefrom, before the federal habeas court will consider the merits of that claim." Edwards v. Carpenter, 529 U.S. 446, 451 (2000).

## V.     Analysis

Davis's amended petition present both procedurally defaulted and properly exhausted claims. The Court considers these claims separately under the relevant standards.

### A.     Davis's Procedurally Defaulted Claims

## 1. Ineffective assistance of counsel

To prevail on a claim of ineffective assistance of counsel, a petitioner must show that (1) counsel's performance fell below an objective standard of reasonableness and (2) counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. Strickland v. Washington, 466 U.S. 668, 687–88 (1984). In analyzing the first element, courts "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Id. at 689. When counsel's performance falls outside that range, the petitioner is not entitled to relief if counsel's error had no effect on the judgment. Id. at 691. Thus to establish "prejudice" the petitioner must prove that, absent counsel's deficient performance, there is a "reasonable probability" that the result of the trial would have been different. Id. at 694. A court need not analyze both Strickland elements "if the defendant makes an insufficient showing on one"—"[i]n particular, a court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of one of the alleged deficiencies." Id. at 697. In limited circumstances, such as when a defense attorney completely fails to subject the prosecution's case to meaningful adversarial testing, prejudice is presumed. Bell v. Quintero, 125 S. Ct. 2240, 2241 (2005); United States v. Cronic, v, 656–57 (1984).

Respondent asserts that the ineffective assistance claims Davis has raised in this petition are procedurally defaulted because they were not presented to the TCCA and can no longer be presented in state court under Tenn. Code Ann. § 40-30-102. (Doc. No. 40, PageID# 1662.) That statute establishes a one-year statute of limitations for post-conviction proceedings, subject to certain exceptions. The Court finds Davis's ineffective assistance claims are procedurally defaulted under that rule.

In her first state post-conviction petition, Davis raised six claims of ineffective assistance of counsel: (1) failure to strike Corey Davis from the jury; (2) failure to call Gail Davis as a witness; (3) inappropriate efforts to persuade family and friends to convince Davis to accept a plea offer, and concession that case was too hard; (4) failure to interview witnesses and adequately prepare for trial; (5) failure to withdraw from representation of Davis given conflict of interest; and (6) failure to adequately cross-examine witness Pamela Goetz. (Doc. No. 49-2, PageID# 1705.) Davis has raised all of those theories of ineffective assistance in her federal petition with the exception of her claim that counsel acted inappropriately in counseling her to accept a plea. (Doc. No. 16, PageID# 73–75.) The trial court addressed only three of Davis's ineffective assistance claims— failure to interview witnesses, failure to withdraw given conflict of interest, and failure to challenge juror Corey Davis. (Doc. No. 49-4, PageID# 1709–10.) Davis concedes that she never appealed the trial court's rejection of those claims to the TCCA. (Doc. No. 16, PageID# 67.)

Davis returned to the trial court with a state habeas corpus petition to repeat her claims of ineffective assistance and to challenge her sentence, although the nature of her ineffective assistance claim is not clear from her petition.[4] (Doc. No. 29-3, PageID# 134–35.) The trial court explained that habeas relief is only available under Tennessee law when a petitioner has shown that the judgment entered against her was "void" or that her "sentence has expired." (Doc. No. 38-

---

[4]     As one of the grounds for relief, Davis "asserts that she was not afforded her constitutional right to effective assistance of counsel" but her petition provides no detail about her theory of ineffective assistance. (Doc. No. 29-3, PageID# 132.) Davis does indicate that she attached a memorandum of law in support of her petition (*id.* at PageID# 135) but no such memorandum was filed with this Court. On reviewing Davis's challenge to the trial court's rejection of her state habeas petition, the TCCA stated that the theory of ineffective assistance of counsel that Davis presented to the trial court was that "her trial attorney was ineffective for allowing [her to be convicted in violation of the Double Jeopardy Clause]." (Doc. No. 38-22, PageID# 1607.) In her federal petition, Davis has not raised an ineffective assistance claim premised on trial counsel's failure to argue that she was not properly indicted. (Doc. No. 16, PageID# 73–75.)

20, PageID# 1574.) Davis's claim of ineffective assistance was therefore not properly "litigated in [a state habeas] proceeding[]." (Id. at PageID# 1575.)

Davis appealed to the TCCA. Her arguments on appeal reveal that her theory of ineffective assistance was that trial counsel "*knowingly* allow[ed] her to be tried and convicted for charges that she was never indicted of." (Id. at PageID# 1566). The TCCA affirmed the trial court, stating that "the bases for denying habeas corpus relief in this case are multi-layered:" (1) Davis had not filed her habeas petition in the court "most convenient in point of distance" as required by state law (Doc. No. 38-22, PageID# 1608) (quoting Tenn. Code Ann. § 29-21-105); (2) neither a violation of double jeopardy nor the Sixth Amendment right to counsel provides a basis for state habeas relief (id. at PageID# 1608–09); and (3) her double jeopardy claim had no merit (id. at PageID# 1609).

In her last effort to challenge her conviction in state court, Davis petitioned the trial court for a writ of error coram nobis and argued that her trial counsel was constitutionally ineffective because he did not adequately explain the charges in her indictment or advise her that "she could only be found guilty of 'sale' or 'delivery.'" (Doc. No. 34-1, PageID# 176.) Davis has not revived either of these theories of ineffective assistance in her federal petition. (Doc. No. 16, PageID# 73–75.) The trial court articulated several grounds for dismissal, including Davis's failure to introduce any "newly discovered evidence," which is the proper foundation of a coram nobis proceeding, and the untimeliness of her petition. (Doc. No. 49-6, PageID# 1716.) The court did not reach the merits of Davis's ineffective assistance claims, stating only that those issues "could have been presented" in her first petition for post-conviction relief. (Id. at PageID# 1716.) Davis did not appeal the court's dismissal. (Doc. No. 16, PageID# 68.)

None of the theories of ineffective assistance of counsel that Davis has raised in her federal petition were presented to the TCCA in any of these proceedings. The only ineffective assistance claim Davis did raise on appeal—that trial counsel "*knowingly* allow[ed] [Davis] to be tried and convicted for charges that she was never indicted of" (Doc. No. 38-20, PageID# 1566)—was rejected on procedural grounds.[5] (Doc. No. 38-22, PageID# 1608–09.) That Davis presented one theory of ineffective assistance to the TCCA is not enough to avoid the procedural default of her other theories. See Wong v. Money, 142 F.3d 313, 322 (6th Cir. 1998) (holding that petitioner had procedurally defaulted her ineffective assistance claim based on a theory of insufficient investigation because that particular theory of ineffective assistance was never presented to the state courts).

---

[5]  Thus even if Davis's claim that trial counsel was ineffective for failing to object to the incompleteness of her indictment (Doc. No. 38-20, PageID# 1566) were held to encompass her claim in this Court that trial counsel was ineffective for failing to object to her arrest without probable cause, the denial of a preliminary hearing, or the trial court's failure to conduct an arraignment (Doc. No. 16, PageID# 78), her federal claim would be procedurally defaulted as dismissed on "independent and adequate" state law grounds. Coleman, 501 U.S. at 734–35. The TCCA's rejection of Davis's ineffective assistance claim does not "fairly appear[]" to rest on or be interwoven with federal law—there is no mention of the standard governing ineffective assistance claims and the TCCA does not reach its merits. (Doc. No. 38-22, PageID# 1608–09). Further, both the statute requiring state habeas petitioners to file in the court "most convenient in point of distance," Tenn. Code Ann. § 29-21-105, and the rule that ineffective assistance claims are not cognizable in state habeas proceedings were "firmly established" and "regularly followed" at the time the TCCA issued its opinion. Mosley v. Fortner, No. 1:08-0013, 2009 WL 2850229, at *9 (M.D. Tenn. Aug. 29, 2009) (quoting Williams v. Coyle, 260 F.3d 684, 693 (6th Cir. 2001); Ivory v. Turner, 2008 WL 4298573, at *5 (M.D. Tenn. Sept. 16, 2008) (explaining that the mandatory nature of § 29-21-105's filing requirement "has been recognized for at least 40 years"); Cooley v. State, No. M2013-00205-CCA-R3-HC, 2013 WL 5975135, at *4 (Tenn. Crim. App. Nov. 8, 2013) (applying § 29-21-105 to dismiss a petition); Montgomery v. State, No. E2011-02629-CCA-R3-HC, 2013 WL 5180586, at *3 (Tenn. Crim. App. Sept. 13, 2013) (same); Edwards v. State, 269 S.W.3d 915, 916 (Tenn. 2008) (explaining that a meritorious claim of ineffective assistance of counsel renders a judgment voidable rather than void and is therefore not an appropriate basis for state habeas relief).

Davis's ineffective assistance claims are therefore procedurally defaulted. Davis has not argued that cause exists to excuse the default. "Because [Davis] makes no attempt to demonstrate cause or prejudice for [her] default . . . [her] claim[s] [are] not cognizable in a federal suit for the writ." Gray v. Netherland, 518 U.S. 152, 162 (1996).

### 2. Improper jury instructions

An improper jury instruction violates the Due Process Clause when it relieves the prosecution of its burden of proving beyond a reasonable doubt "every fact necessary to constitute the crime with which [the defendant] is charged." In re Winship, 397 U.S. 358, 364 (1970). Davis argues that the jury instruction on criminal responsibility for facilitation of felony given in her trial "require[d] the State to prove beyond a reasonable doubt only that the elements of the underlying offense were committed by another, rather than that Ms. Davis (a) acting with the intent to promote or assist in the commission of an offense, or to benefit in the proceeds or results of the offense[,] (b) solicited, directed, aided, or attempted to aid her co-defendant, Serena Ward, to commit the charged offense." (Doc. No. 16, PageID# 76–77.) Davis argues the instruction allowed the jury to convict her "based merely upon her alleged awareness of the charged conduct without finding that Davis had a conscious objective or desire to cause the result of a sale or delivery of cocaine." (Id. at PageID# 77.)

The trial court instructed the jury as follows regarding criminal responsibility:

The defendant is criminally responsible for an offense committed by the conduct of another if, acting with the intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the defendant solicits, directs, aids, or attempts to aid another person to commit the offense.

A defendant who is criminally responsible for an offense may be found guilty not only of that offense, but also for any other offense or offenses committed by another, if you find beyond a reasonable doubt that the other offense or offenses committed were natural and probable consequences of the original offense for which the defendant is found criminally responsible, and that the elements of the

other offense or offenses that accompanied the original offense have been proven beyond a reasonable doubt.

In deciding the criminal responsibility of the defendant, the jury may also take into consideration any evidence offered that the defendant attempted to thwart or withdraw from any of the offenses that followed from the original offense.

Before you find the defendant guilty of being criminally responsible for a criminal offense, committed by the conduct of another, you must find that all the essential elements of said offense have been proven by the state beyond a reasonable doubt.

(Doc. No. 38-1, PageID# 261–62.)

The jury was also instructed with the lesser included offense of facilitation of a felony.

That instruction provided:

Any person who commits the offense of facilitation of a felony is guilty of a crime.

For you to find the defendant guilty of this offense, the state must have proven beyond a reasonable doubt the existence of the following essential elements, that on or about October 29th, 2008:

(1) The defendant knew that another person intended to commit the specific felony of Sale of a Schedule II Controlled Substance, but did not have the intent to promote or assist the commission of the offense or to benefit in the proceeds or results of the offense; and

(2) The defendant furnished substantial assistance to that person in the commission of the felony; and

(3) The defendant furnished such assistance knowingly.

(Id. at PageID# 249.)

Davis also objects to the jury instruction on "knowing" and "intentional," which "allowed the jury to convict [her] based merely upon her alleged awareness of the charged conduct without finding that [she] had a conscious objective or desire to cause the result of a sale or delivery of cocaine." (Doc. No. 16, PageID# 77.) The jury instructions provided the following definitions of those terms:

"Knowingly" means that a person acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist. A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result. The requirement of "knowingly" is also established if it is shown that the defendant acted intentionally.

"Intentionally" and "intent" mean that a person acts intentionally with respect to the nature of the conduct or to a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result.

(Doc. No. 38-1, PageID# 266–67.)

Davis did not raise her claims of improper jury instruction in any of the state proceedings she initiated. (Doc. No. 34-1, PageID# 175–77; Doc. No. 38-14, PageID# 1339; Doc. No. 38-20, PageID# 1568–69; Doc. No. 49-2, PageID# 1704–05.) Respondent argues that, because Davis failed to raise those claims on direct appeal, they are procedurally defaulted. (Doc. No. 40, PageID# 1663.) The requirement that a due process challenge to jury instructions must be brought on direct appeal is anchored in Tennessee Supreme Court Rule 28 § 2(D) and Tennessee Code Annotated § 40-30-106(g), which both state that a ground for relief is waived if a petitioner failed to present the ground for "determination in any proceeding before a court of competent jurisdiction in which the ground could have been presented." Tenn. Code Ann. § 40-30-106(g); Tenn. Sup. Ct. R. 28 § 2(D); see also Winfield v. State, No. W2003-00889-CCA-R3-PC, 2003 WL 22922272, at *5 (Tenn. Crim. App. Dec. 10, 2003) (holding that petitioner's concededly meritorious jury instruction claim was waived when it was not raised on direct appeal). Davis waived her improper jury instruction claims when she failed to raise them on direct appeal and they are now procedurally defaulted.

Davis again does not argue cause for that default or prejudice arising from it. Accordingly, no habeas relief is available to her on this claim. Gray, 518 U.S. at 162.

### 3.  Violation of **Brady**

Davis's motion to amend her petition (Doc. No. 55) and her motion for discovery (Doc. No. 48) both pertain to her Brady claim (Doc. No. 16, PageID# 75–76). In her motion for discovery, Davis seeks "valuable impeachment evidence pertaining to the three confidential informants who testified against her"—Christine Guerrero, Pamela Goetz, and Fredia Johnson. (Doc. No. 48, PageID# 1686.) In particular, Davis seeks evidence of any benefits that the informants received in exchange for their cooperation in prosecuting her. (Id. at PageID# 1684–85.) Davis has requested that the Court order production of the following:

> (1) The confidential informant files of the 17th Judicial Drug Task Force and the District Attorney General for the 17th Judicial District regarding Fredia Johnson, Pamela Polly-Goetz, and Christine Guerrero.
>
> (2) Any and all reports, logs, or memos of the 17th Judicial Drug Task Force and/or the District Attorney General for the 17th Judicial District memorializing payments, agreements, or other benefits conferred to confidential informants Fredia Johnson, Pamela Polly-Goetz, and/or Christine Guerrero for the period from 2004 through 2010.
>
> (3) The file of the District Attorney General for the 17th Judicial District regarding the prosecution of Tiffany Davis in Case No. 09CR108.
>
> (4) Any and all records of the 17th Judicial Drug Task Force and the Lewisburg City Police Department developed in the course of the investigation and prosecution of Tiffany Davis in Case No. 09CR108.

(Id. at PageID# 1686.) Respondent opposes Davis's discovery motion, characterizing it as a fishing expedition and arguing that the underlying Brady claim is procedurally defaulted. (Doc. No. 52, PageID# 1723–24.)

In both her reply to Respondent's response (Doc. No. 56) and her proposed amended petition (Doc. No. 55), Davis elaborates on her argument that impeachment evidence was withheld. First, she points to a newly obtained record showing that informant Johnson received a favorable plea deal not long after testifying against Davis, which calls into question Johnson's testimony at trial that she was not getting a deal in exchange for her cooperation. (Doc. No. 55-1, PageID#

1743; Doc. No. 56, PageID# 1749.) Second, Davis points out that, at trial, Johnson conceded that she received $100 for each controlled buy she engaged in and that Guerrero acknowledged that she received a "favor" in exchange for her cooperation. (Doc. No. 55-1, PageID# 1744.) Although the record contains no evidence that Goetz similarly received a benefit in exchange for her testimony, Davis argues that it "strains credulity" to think that a long-time informant like Goetz would have received no inducement to cooperate with law enforcement, especially given that Johnson and Guerrero both received some benefit. (Id.; Doc. No. 56, PageID# 1751.) Davis states that granting her discovery will enable her to establish a violation of Brady and Giglio based on withheld evidence regarding Goetz's cooperation. (Doc. No. 56, PageID# 1751.)

Davis no longer has any means of pursuing her Brady claim in state court. She did not raise it in her direct appeal or in any post-conviction proceeding. (Doc. No. 34-1, PageID# 175–77; Doc. No. 38-14, PageID# 1339; Doc. No. 38-20, PageID# 1568–69; Doc. No. 49-2, PageID# 1704–05.) Tennessee law does allow a petition for post-conviction relief to be reopened in limited circumstances that do not include a claim that the State violated Brady by withholding exculpatory evidence. Tenn. Code Ann. § 40-30-117; Harbison v. Bell, 408 F.3d 823, 831 (6th Cir. 2005) (citing Harris v. State. 102 S.W.3d 587, 591 (Tenn. 2003)). The claim is therefore procedurally defaulted.

A meritorious Brady claim may excuse procedural default, and Davis seeks discovery for that reason. (Doc. No. 48, PageID# 1681 (quoting Payne v. Bell, 28 F. Supp. 2d 967, 970 (W.D. Tenn. 2000).) "[S]howing an actual Brady violation is itself sufficient to show cause and prejudice." Jones v. Bagley, 696 F.3d 475, 486–87 (6th Cir. 2012); Brooks v. Tennessee, 626 F.3d 878, 890–91 (6th Cir. 2010); Bell v. Bell, 512 F.3d 223, 230 n.3 (6th Cir. 2008). A petitioner demonstrates good cause to pursue discovery in the context of a habeas petition "where specific

allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that [she] is . . . entitled to relief . . . ." Bracy v. Gramley, 520 U.S. 899, 908–09 (1997); Rule 6(a), Rules Gov'g § 2254 Cases. "The burden of demonstrating the materiality of the information requested is on the moving party." [6] Williams v. Bagley, 380 F.3d 932, 974 (6th Cir. 2004) (quoting Stanford v. Parker, 266 F.3d 442, 460 (6th Cir. 2001)).

To be entitled to relief on her Brady claim, Davis must establish that (1) the relevant evidence would have been favorable to her, (2) the State suppressed that evidence, willfully or not, and (3) the evidence is "material," meaning that its suppression caused prejudice. Strickler v. Greene, 527 U.S. 263, 281–82 (1999); Thomas v. Westbrooks, 849 F.3d 659, 663 (6th Cir. 2017). Brady's disclosure obligation extends to material evidence that is known only to police investigators and to any agreement that the State has reached with a witness to induce cooperation in a prosecution. Strickler, 527 U.S. at 280–81; Giglio v. United States, 405 U.S. 150, 154–55 (1972). The standard governing analysis of the "materiality" of the suppressed evidence depends on the context of the prosecution. Rosencrantz v. Lafler, 568 F.3d 577, 584 (6th Cir. 2009). If "undisclosed evidence demonstrates that the prosecution's case includes perjured testimony and

---

[6] Davis cites Bracy v. Gramley, 520 U.S. 899 (1997) and Pham v. Terhune, 400 F.3d 740, 743 (9th Cir. 2005) for the proposition that she need not demonstrate that she will ultimately prevail on her Brady claim at this point. (Doc. No. 48, PageID# 1684.) In Bracy, the Court held that discovery under Rule 6(a) was warranted where petitioner had offered specific allegations sufficient to support a finding of judicial bias, even though the requested discovery might not end up producing evidence to confirm that theory. Bracy, 520 U.S. at 908–09. Such a holding is not inconsistent with the Sixth Circuit's rule that the movant for Rule 6(a) discovery has the burden of establishing the materiality of the information requested, which simply requires the movant to show that, if discovery goes as planned, she will be entitled to relief. While the court in Pham did decline to analyze the merits of the Brady claim to which the Rule 6(a) discovery motion related, the Sixth Circuit has taken the opposite approach and denied Rule 6(a) discovery requests when the movant has failed to demonstrate that the evidence sought is material—i.e., that its production would entitle the movant to relief. Compare Pham, 400 F.3d at 743, with Williams v. Bagley, 380 F.3d 932, 974 (6th Cir. 2004).

that the prosecution knew, or should have known, of the perjury" then that evidence is "material" if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." United States v. Agurs, 427 U.S. 97, 103 (1976). Otherwise, favorable evidence that has been withheld is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." Kyles v. Whitley, 514 U.S. 419, 433 (1995).

Davis has adequately identified the "inducements" she expects to uncover through discovery—undisclosed deals with Goetz and Johnson and clarification of the nature of the deal entered into with Guerrero—and the trial record and recently discovered favorable resolution of Johnson's prior felony charge make her allegations concerning those inducements more than conclusory. (See Doc. No. 48, PageID# 1685.) Evidence of a deal with Goetz and Johnson would have allowed Davis to further impeach those witnesses; if such evidence exists, it was apparently not produced. Davis has thus provided "reason to believe" that she might meet the first two elements of a Brady claim. Bracy, 520 U.S. at 908–09; see also Thomas, 849 F.3d at 663.

However, Davis has failed to demonstrate that the evidence she seeks would have been material. Davis argues that, if "undisclosed impeachment evidence pertaining to any of the three confidential informants" is revealed she will "stand a good chance of proving a due process violation" "because the confidential informants provided the only evidence of her involvement in most of the drug transaction." (Doc. No. 48, PageID# 1685.) To support her argument, Davis provides a chart which shows that, in six of the eight transactions for which Davis was convicted, the testimony of either Goetz, Guerrero, or Johnson provided the only direct evidence linking

Davis to those transactions.[7] (Id. at PageID# 1678–80.) Davis claims that there is a "reasonable probability that the jury would have reached a different verdict had it learned of all of the impeachment evidence against Guerrero, Johnson and/or Goetz." (Id. at PageID# 1685.) Respondent disagrees, arguing that, "even if there might have been evidence of undisclosed 'inducements' this, at most, would have been cumulative because the witness was thoroughly cross-examined in other ways, including by impeachment with [her] prior felony convictions." (Doc. No. 52, PageID# 1724.) In her reply, Davis does not address Respondent's assertion that the evidence she seeks would be cumulative rather than material and instead reiterates that discovery "will allow her to fully develop the facts and quite probably establish a violation of due process . . ." (Doc. No. 56, PageID# 1751.)

The Sixth Circuit has held that, "where undisclosed evidence merely furnishes an additional basis on which to challenge a witness whose credibility has already been shown to be questionable or who is subject to extensive attack by reason of other evidence, the undisclosed evidence may be cumulative, and hence not material." Williams, 380 F.3d at 977 (quoting Byrd v. Collins, 209 F.3d 486, 518 (6th Cir. 2000)). In Williams, the court noted that the relevant witness's "credibility already had been seriously undercut by disclosing seven prior felony convictions" and upheld the trial court's conclusion that "any further impeachment of his testimony would have been cumulative." Id. at 976–77. Here, all three confidential informant witnesses were thoroughly impeached during Davis's trial.

---

[7]     The only inaccuracy in Davis's chart concerns the August 7, 2008 transaction. Davis's chart indicates that there was no evidence to corroborate Guerrero's testimony that Davis was home during the August 7, 2008 transaction there, but the record reflects that Drug Task Force Agent Miller observed through binoculars Davis peek her head out of the house as Guerrero arrived. (Doc. No. 38-4, PageID# 418–20.)

On cross-examination of Goetz, defense counsel questioned her regarding her criminal history (passing worthless checks and forgery), drug use, and prior informant work, and probed the existence of any inducement to work on Davis's case. (Doc. No. 38-5, PageID# 524–25, 604). On cross-examination of Johnson, defense counsel questioned her regarding her criminal history (forgery), drug use, pending felony charge for sale of cocaine, and receipt of payments in exchange for her informant work. (Doc. No. 38-6, PageID# 825–28.) On cross-examination of Guerrero, defense counsel questioned her regarding her criminal history (fraudulent use of a debit card and theft), drug use, and the deal she had entered into with the Drug Task Force relating to her son's legal trouble. (Doc. No. 38-4, PageID# 395–402.) Such extensive impeachment of the witnesses who testified against Davis makes it difficult to accept Davis's assertion that there is a reasonable probability that the outcome of the trial would have been different had additional deals been disclosed. That is especially so in the absence of any argument from Davis as to why the evidence she seeks would not be cumulative.

Davis has not shown that the evidence she seeks would be material and therefore has not established that there is good cause to support discovery under Rule 6(a). See Williams, 380 F.3d at 974. Her motion for discovery (Doc. No. 48) and her motion to amend her petition (Doc. No. 55) will therefore be denied. Because Davis has failed to show that she might develop a meritorious Brady claim through discovery, she has failed to establish cause and prejudice to excuse the procedural default of that claim. See Jones, 696 F.3d at 486–87.

### B.    Davis's sufficiency of the evidence claim

The TCCA ruled on the merits of Davis's sufficiency of the evidence claim, and Respondent correctly concedes that the claim is not procedurally defaulted. (Doc. No. 40, PageID# 1663.) The TCCA's treatment of that claim is as follows:

### b. *Sufficiency of the Evidence*

### *Standard of Review*

When a defendant challenges the sufficiency of the evidence supporting his or her convictions, our standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); see also Tenn. R.App. P. 13(e). After a jury finds a defendant guilty, the presumption of innocence is replaced with a presumption of guilt. State v. Evans, 838 S.W.2d 185, 191 (Tenn.1992). Consequently, the defendant has the burden on appeal of demonstrating that the evidence was insufficient to support the jury's verdict. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn.1982). The appellate court does not weigh the evidence anew; rather, "a jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts" in the testimony and all reasonably drawn inferences in favor of the State. State v. Harris, 839 S.W.2d 54, 75 (Tenn.1992). Thus, "the State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom." Id. at 75 (citation omitted). This standard of review applies to guilty verdicts based upon direct or circumstantial evidence. State v. Dorantes, 331 S.W.3d 370, 379 (Tenn.2011) (citing State v. Hanson, 279 S.W.3d 265, 275 (Tenn.2009)). In Dorantes, our Supreme Court adopted the United States Supreme Court standard that "direct and circumstantial evidence should be treated the same when weighing the sufficiency of such evidence." Id. at 381. Accordingly, the evidence need not exclude every other reasonable hypothesis except that of the defendant's guilt, provided the defendant's guilt is established beyond a reasonable doubt. Id.

The weight and credibility given to the testimony of witnesses, and the reconciliation of conflicts in that testimony, are questions of fact. State v. Sheffield, 676 S.W.2d 542, 547 (Tenn.1984). Thus, the credibility of an eyewitness identifying the accused as the perpetrator of the crime for which she stands trial is a matter entrusted to the trier of fact and not this Court. i, 885 S.W.2d 85, 87 (Tenn.Crim.App.1993). It is not the role of this Court to reevaluate the evidence or substitute its own inferences for those drawn by the jury. State v. Winters, 137 S.W.3d 641, 655 (Tenn.Crim.App.2003) (citations omitted).

With these standards in mind, we will now review the sufficiency of the evidence supporting each conviction.

### *I.*

The jury found the Defendant guilty in Counts 1 and 2, respectively, of the sale and delivery of less than 0.5 grams of cocaine. The trial court merged the convictions. Our criminal statutes provide that it is an offense to knowingly sell or deliver a controlled substance. Tenn.Code Ann. § 39–17–417(a)(2)–(3) (Supp.2008).

Cocaine is a controlled substance, and the delivery of less than 0.5 grams of cocaine is a Class C felony. Tenn.Code Ann. §§ 39–17–408(b)(4) (Supp.2008),—417(c)(2)(A) (Supp.2008). "[A] person ... acts knowingly with respect to the conduct or to circumstances surrounding the conduct when the person is aware of the nature of the conduct or that the circumstances exist." Tenn.Code Ann. § 39–11–302(b) (2006). Although not statutorily defined, a "sale" requires "a bargained-for offer and acceptance, and an actual or constructive transfer or delivery of the subject matter property." State v. Holston, 94 S.W.3d 507, 510 (Tenn.Crim.App.2002). The terms "deliver" and "delivery" are statutorily defined as "the actual, constructive, or attempted transfer from one person to another of a controlled substance, whether or not there is an agency relationship." Tenn.Code Ann. § 39–17–402(6) (2006).

The evidence shows that on August 6, 2008, CI Guerrero called the Defendant's cell phone and spoke to the Defendant about purchasing $60 worth of crack cocaine later that day. According to CI Guerrero, the Defendant affirmatively stated that she could sell CI Guerrero crack cocaine and requested that CI Guerrero bring her a two-liter bottle of soda when she came to purchase the drugs. Subsequently, under visual surveillance by DTF agents, CI Guerrero entered the Defendant's home. CI Guerrero testified that while she was in the Defendant's home, the Defendant handed her a yellow napkin containing a rock-like substance. CI Guerrero then gave the Defendant $57, and the Defendant's daughter retrieved the soda from CI Guerrero's vehicle. The substance in the napkin tested positive for cocaine and weighed 0.3 grams. The Defendant denied that CI Guerrero called her cell phone and denied selling her illegal drugs. The jury's guilty verdict implicitly rejects the Defendant's claims, and, as noted above, we will not disturb the jury's witness credibility findings. Strickland, 885 S.W.2d at 87. Viewed in the light most favorable to the State, we conclude that the evidence presented was sufficient to sustain the jury's verdict.

## II.

The jury found the Defendant guilty in Counts 3 and 5, respectively, of the sale and conspiracy to sell 0.5 grams or more of cocaine. Tenn.Code Ann. §§ 39–17–417(a)(3) and (c)(1); 39–12–103 (2006). At the State's urging, the trial court merged the conspiracy conviction into the sale conviction. We note that a conspiracy conviction is independent from the offense it was created to commit and that double jeopardy principles do not demand that it be merged into the target offense. See State v. Thornton, 10 S.W.3d 229, 238–241 (Tenn.Crim.App.1999). On appeal, the State does not ask that we reverse the mergers that it requested at trial, and we decline to do so *sua sponte. See* Tenn. R.App. P. 36(a) ("Nothing in this rule shall be construed as requiring relief be granted to a party responsible for an error...."). Accordingly, we will review only the evidence supporting the Defendant's conviction for the sale of 0.5 grams or more of cocaine, a Class B felony. See Tenn.Code Ann. § 39–17–417(c)(1) (Supp.2008).

Viewed in the light most favorable to the State, the evidence shows that the Defendant arranged over the telephone to sell to CI Goetz a certain amount of cocaine for a certain price at a certain time and place. CI Goetz and Agent Webster went to the prearranged location expecting to meet the Defendant. When the Defendant was not there, CI Goetz called the Defendant, and the Defendant told her that Ward would be meeting her instead to complete the transaction. Ward soon arrived at the appointed time and place in a vehicle registered to the Defendant. When CI Goetz approached Ward, Ward handed her 0.5 grams of cocaine and CI Goetz handed Ward $80. CI Goetz testified that there was no need for her to discuss the price or amount of the cocaine because "she [i.e., Ward] knew what I wanted." A couple of minutes after the drug transaction, the Defendant called CI Goetz's cell phone to verify that CI Goetz had "made contact with Serena Ward." DTF agents followed Ward as she returned to the Defendant's residence immediately following the transaction. Later, the Defendant again called CI Goetz and told her that she was leaving town and asked CI Goetz if she needed any more crack cocaine.

The Defendant asserts that no reasonable juror could have concluded that she knowingly sold the cocaine because the Defendant was not present at the time and place the transaction actually occurred. Under the facts presented, we disagree. A sale first requires a bargained-for offer and acceptance. Holston, 94 S.W.3d at 510. Here, a reasonable juror could have concluded that the offer and acceptance occurred over the telephone when CI Goetz and the Defendant arranged the price and amount for the illegal drugs. Second, a sale requires actual or constructive delivery of the illegal drugs. Id. Based on the evidence presented, a reasonable juror could have concluded that the Defendant was acting constructively through Ward to effect the drug transaction. The Defendant told CI Goetz that Ward would meet her at Kroger to deliver the drugs. When Ward arrived, she knew the exact amount and price of the drugs and transferred them to CI Goetz. Afterwards, the Defendant verified with CI Goetz that Ward had successfully delivered the drugs and, in fact, asked whether CI Goetz needed more drugs. We conclude that this evidence was sufficient to convict the Defendant of the sale of 0.5 grams or more of cocaine.

### III.

The jury found the Defendant guilty in Count 6 of the lesser included offense of facilitation of the sale of 0.5 grams or more of cocaine. She was also found guilty in Count 8 of the conspiracy to sell 0.5 grams or more of cocaine. As in Counts 3 and 5, the trial court merged the conspiracy conviction into the facilitation conviction at the State's request. On appeal, the State does not ask that we reverse the mergers that it requested at trial, and we decline to do so *sua sponte. See* Tenn. R.App. P. 36(a). Therefore, we will review only the sufficiency of the evidence supporting the facilitation conviction.

Our criminal code provides that "[a] person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39–11–402(2),

the person knowingly furnishes substantial assistance in the commission of the felony." Tenn.Code Ann. § 39–11–403(a) (2006). The trial court charged facilitation as a lesser included offense of the sale of 0.5 grams or more of cocaine; thus, the conviction was a Class C felony. *See* Tenn.Code Ann. § 39–11–403(b), Sentencing Comm'n Cmts. (explaining that "[a] defendant charged as a party may be found guilty of facilitation as a lesser included offense if the defendant's degree of complicity is insufficient to warrant conviction as a party").

Viewed in the light most favorable to the State, the evidence establishes that the Defendant arranged over the telephone to meet CI Goetz at Food Lion to sell her $80 worth of crack cocaine. Once at the Food Lion, CI Goetz called the Defendant, and the Defendant told her that she was already there. CI Goetz visually identified the Defendant sitting in the front passenger seat of a silver Buick that was parked behind Agent Webster's vehicle. She also saw another man sitting in the vehicle but could not identify him. Ward exited the Buick, approached CI Goetz, and gave CI Goetz two loose rock substances in exchange for $80. This transaction occurred directly beside Agent Webster, although he did not see the Defendant in the car. The two loose rocks substances tested positive for cocaine and weighed 0.7 grams. Agent George followed the silver car from the parking lot and watched it return to the Defendant's residence, where he saw three people exit the vehicle.

The Defendant contends that she was not present for this transaction. She argues that the only evidence linking her to the offense were the phone calls, and that CI Goetz admitted she was unfamiliar with the Defendant's voice. The Defendant thus concludes that the evidence was insufficient to support her conviction.

We disagree. Although it is true that in discussing a previous transaction, CI Goetz stated that she had difficulty distinguishing the Defendant's voice from Ward's, she also recanted that testimony and affirmatively stated that she was familiar with the Defendant's voice. Moreover, in discussing the facts of this particular transaction, CI Goetz never wavered in maintaining that she spoke with the Defendant on the telephone in arranging this drug transaction. The drug purchase then proceeded according to their arrangements. The Defendant arrived with Ward (and an unidentified man) at the time and place discussed in the recorded phone call. CI Goetz identified the Defendant as the person sitting in the front passenger seat of the silver Buick. After the drug sale was completed, the vehicle returned to the Defendant's apartment. The evidence plainly established that the Defendant, knowing that Ward intended to sell illegal drugs to CI Goetz, knowingly furnished Ward with substantial assistance in doing so. Accordingly, we conclude that the jury's verdict was supported by sufficient evidence.

### IV.

The Defendant was found guilty in Count 10 of the delivery of 0.5 grams or more of cocaine, a Class B felony. *See* Tenn.Code Ann. § 39–17–417(a)(2), (c)(1).

CI Goetz testified that she called the Defendant's cell phone twice on October 31, 2008, once speaking with the Defendant and once with Ward. In the latter phone conversation, CI Goetz and Ward arranged to meet at a Krystal restaurant to buy and sell $80 worth of crack cocaine. A short time later, the Defendant and Ward arrived at the restaurant in the Defendant's vehicle with Ward driving and the Defendant in the front passenger seat. CI Goetz approached the passenger's side of the vehicle, but the Defendant motioned for her to approach the driver's side. CI Goetz testified that, as she stood beside the driver's side door, she saw the Defendant hand Ward a rock-like substance wrapped in white paper. Ward then handed it to CI Goetz. CI Goetz testified that she then handed Ward $80, and Ward handed the money to the Defendant. Agent Webster saw the transaction take place as described by CI Goetz. Additionally, the transaction was videotaped and played for the jury. The substance in the white paper tested positive for cocaine and weighed 0.5 grams.

The Defendant, who maintains that she was not present at the scene of the crime, asserts that she is not visible on the video recording. However, both CI Goetz and Agent Webster identified her as being in the front passenger seat of the car from whence the drugs originated. CI Goetz stated that she watched the Defendant hand the drugs to Ward, who handed them to CI Goetz. This evidence is sufficient for a jury to conclude that the Defendant delivered 0.5 grams or more of cocaine. Accordingly, we affirm the jury's verdict.

*V.*

The Defendant was convicted in Counts 11 and 12, respectively, of the sale and delivery of 0.5 grams or more of cocaine. The trial court merged the convictions.

Taken in the light most favorable to the State, the evidence establishes that CI Goetz spoke with the Defendant twice over the telephone about purchasing $140 worth of crack cocaine. The second phone conversation was recorded and played for the jury although the audio was distorted. In this latter conversation, CI Goetz and the Defendant arranged to meet at a local gas station. A short time later, the Defendant arrived at the gas station. She was in the passenger seat of the vehicle and Ward was driving. CI Goetz got into the rear seat of the vehicle. She testified that as the Defendant was handing her a clear plastic bag with drugs inside, Ward "grabbed the bag of dope" out of the Defendant's hand and told CI Goetz, "If it wasn't for me, you wouldn't be getting no dope." Ward then "took a piece of [the] dope out" and handed CI Goetz the bag. CI Goetz then handed $140 to the Defendant. The contents of the plastic bag tested positive for cocaine base and weighed 0.8 grams.

The Defendant first argues that she was not present at the scene of the transaction. She points out that Agent Webster did not identify her and that she was not visible on the video recording. However, CI Goetz identified the Defendant as the person sitting in the driver's seat of the vehicle, and this identification was sufficient to establish the Defendant's presence at the scene.

The Defendant next argues that Ward's statements after grabbing the drugs from the Defendant indicate that she was the person responsible for selling the drugs. We are not persuaded. First, we note that the Defendant's arguments are inconsistent— either she was inside the vehicle at the time of the offense or she was not. Second, the fact that Ward momentarily seized the drugs from the Defendant and took some for herself is irrelevant because the evidence shows that it was the Defendant who produced the illegal drugs and received money in their exchange. Lastly, CI Goetz testified that she understood Ward's statement to mean that Ward had introduced CI Goetz to the Defendant. CI Goetz thus provided a plausible explanation to the jury, and to the extent the jury credited CI Goetz's testimony over the Defendant's we will not disturb its verdict. Thus, we conclude that the evidence was sufficient to support the jury's verdict.

### VI.

The Defendant was convicted in Counts 13 and 14, respectively, of the sale and delivery of 0.5 grams or more of cocaine. The trial court merged the convictions.

The evidence established that CI Goetz twice called the Defendant to arrange to purchase crack cocaine. The latter phone call was recorded and played for the jury. In this phone call, the Defendant agreed to meet CI Goetz at a local liquor store to sell her $180 worth of crack cocaine. Agent Webster and CI Goetz arrived simultaneously with the Defendant. CI Goetz exited Agent Webster's vehicle and entered the backseat of the Defendant's vehicle. According to CI Goetz, the Defendant asked her to go into the store and buy beer, which she did. When CI Goetz returned, the Defendant told her that there was a cigarette box in the backseat of the car. CI Goetz testified that the box contained "the dope." CI Goetz handed the Defendant $180 and left. The contents of the cigarette box tested positive for cocaine base and weighed 1.4 grams. The Defendant denied being at the liquor store at the time of the transaction; however, both Agent Webster and CI Goetz visually identified her. The jury's verdict clearly accredited the testimony of Agent Webster and CI Goetz over the Defendant, and we will not disturb that verdict on appeal. Taken in the light most favorable to the State, we conclude that this evidence was sufficient to support the jury's verdict.

### VII.

The Defendant was convicted in Count 16 of the delivery of less than 0.5 grams of cocaine. In this case, CI Johnson spoke over the telephone with the Defendant about purchasing $100 worth of crack cocaine at the Defendant's residence. This phone call was recorded and played for the jury. CI Johnson was given $100 in "buy money" with recorded serial numbers. She then drove to the Defendant's home, knocked on the door, and entered. CI Johnson testified that the Defendant handed her a piece of paper with crack cocaine in it and that she handed the Defendant $100. CI Johnson then left. Her entrance and exit from the Defendant's house was under constant visual surveillance by DTF agents. The substance in the paper tested positive for cocaine base and weighed 0.3 grams.

Soon after, Assistant Director Miller watched Perkins arrive at the Defendant's residence in a silver Buick and watched the Defendant and another man get into the vehicle and leave. DTF agents stopped the car based upon a felony warrant they had acquired for the Defendant. They recovered from the Defendant's person money bearing the same serial numbers as the buy money used that day by CI Johnson. DTF agents also recovered from the Defendant's person a cell phone that had been used in each of the prior controlled buy transactions. The Defendant denied being at her home at the time that the transaction occurred and denied selling CI Johnson illegal drugs. Thus, the jury's verdict accredits the testimony of CI Johnson and the DTF agents and discredits the Defendant's testimony. Therefore, we will not disturb that verdict. Accordingly, we conclude that this evidence was sufficient to support the jury's verdict.

### VIII.

The Defendant was convicted in Count 18 of the delivery of less than 0.5 grams of cocaine. The evidence established that CI Johnson called the Defendant and spoke with her about purchasing $100 worth of crack cocaine later that day. After a series of phone calls and failed attempts to rendezvous, the Defendant and CI Goetz arranged via cell phone to meet at the Defendant's home. This phone call was recorded and played for the jury. DTF agents set up a surveillance position and watched as CI Johnson entered the Defendant's home. CI Johnson testified that the Defendant handed her crack cocaine wrapped in a folded piece of paper and that she handed the Defendant $100. An audio recording of this transaction was made and played for the jury. The substance tested positive for cocaine base and weighed 0.4 grams. The Defendant denied speaking to CI Johnson or selling her crack cocaine. From the jury's verdict, we discern that it accredited the testimony of CI Johnson over that of the Defendant. Therefore, we conclude that the evidence was sufficient to support the jury's verdict.

### Summary

After a careful review of the record, we conclude that sufficient evidence was presented to support each conviction. Accordingly, the Defendant is entitled to no relief on this issue.

Davis I, 2012 WL 1372078, at *14–19.

### 1. The TCCA's decision was not contrary to clearly established law.

To prevail on a claim of insufficient evidence, a petitioner must show that, when the evidence is viewed "in the light most favorable to the prosecution," no "rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson, 443 U.S at

319. This deferential standard preserves the role of the trier of fact as the entity that resolves "conflicts in the testimony," "weigh[s] the evidence," and "draw[s] reasonable inferences from basic facts to ultimate facts." Id. "[U]nder Jackson, the assessment of the credibility of witnesses is generally beyond the scope of review." Schlup v. Delo, 513 U.S. 298, 330 (1995). The TCCA correctly identified Jackson v. Virginia as governing resolution of Davis's insufficiency of the evidence claim. Davis I, 2012 WL 1372078, at *14. The TCCA's decision was not contrary to this clearly established law.

**2.  The TCCA's decision was not an unreasonable application of clearly established law.**

Davis's attack on the sufficiency of the evidence can almost entirely be reduced to doubts about the credibility of the confidential informant witnesses who testified against her. "The State's case," Davis argues, "turned substantially" on the testimony of those informants because they were often the only evidence the State had that Davis was at the scenes of the controlled cocaine transactions. Davis argues that:

> On Counts 3, 4, 5, 6, 7, 8, 11, and 12, Ms. Goetz's identification of Ms. Davis as a participant at the scene of the transactions was uncorroborated by any of the law enforcement witnesses" [and] "both Fredia Johnson's and Christine Guerrero's identifications of Ms. Davis as the person who sold them cocaine in Counts 1, 2, 15, 16, 17, and 18, were not corroborated by any law enforcement officers surveilling the transactions.

(Doc. No. 16, PageID# 77.)  Further, Davis argues that Goetz's identifications were particularly unreliable given that Goetz "changed critical details of her account during the course of her testimony." (Id.) Davis claims that "no rational trier of fact" faced with the uncorroborated testimony of the informants could have found Davis guilty beyond a reasonable doubt of the above-listed counts. (Id.) In fact, the jury did not find Davis guilty of several of those counts, including 4, 7, 15, and 17. Davis I, 2012 WL 1372078, at *5, 6, 11.

In rejecting Davis's position, the TCCA properly noted that most of Davis's claims of insufficiency were grounded in her disagreement with the jury's credibility findings, which is not alone sufficient to support a claim of insufficient evidence. On counts 1 (sale) and 2 (delivery), which were merged, the jury was presented with conflicting testimony—Davis denied that, on August 6, 2008, she spoke with Guerrero on the phone to set up a sale and denied that she later actualized that sale, while Guerrero testified to the contrary. Id. at *15. The jury found Guerrero more credible than Davis and the TCCA refused to disturb that finding. Id. With respect to counts 6 (facilitation) and 8 (conspiracy, merged with 6), which arose out of a staged transaction at a Food Lion grocery store on October 29, 2008, the jury credited Goetz's testimony—that Davis arranged over the phone to sell Goetz cocaine outside the grocery store and that Davis was present during the transaction—over Davis's denials. Id. at *6, 16–17. Again, the TCCA declined to upset the jury's credibility determination, noting that, although Goetz initially conceded that she had trouble distinguishing Davis's voice from that of co-defendant Ward, she ultimately recanted that testimony. Id. at *17.

The pattern continued with counts 11 (sale) and 12 (delivery, merged with 11)—Davis denied being at the transaction site (a BP gas station) on November 4, 2008, but the jury believed the testimony of informant Goetz, who testified that Davis had arranged the sale over the phone, showed up at the gas station, and completed the transaction. Id. at *18. The TCCA found that Goetz's "identification was sufficient to establish the Defendant's presence at the scene" and that "to the extent the jury credited CI Goetz's testimony over the Defendant's[,] [the TCCA would] not disturb its verdict." Id. at *8, 18.

On counts 16 and 18 (both delivery), which emerged from staged transactions at Davis's home on February 11, 2009, and February 19, 2009, respectively, Davis denied arranging the sales

over the phone with Johnson and denied being home when the transactions occurred. Id. at *9, 11, 19. Johnson testified to the contrary, adding that Davis had handed her the cocaine in each instance. Id. at *19. The TCCA found that the jury had credited Johnson's testimony, and refused to overturn that credibility determination. Id.

The TCCA did not unreasonably apply Jackson in reaching these conclusions. In each determination, the TCCA laid out the conflicting evidence and found that the testimony favorable to the prosecution, if believed, could support the jury's verdict. Davis's emphasis on the uncorroborated status of much of the informants' testimony is more a challenge to "the quality of the government's evidence" rather than its "sufficiency." Moreland v. Bradshaw, 699 F.3d 908, 920 (6th Cir. 2012) (quoting Martin v. Mitchell, 280 F.3d 594, 618 (6th Cir. 2002); see also United States v. Watkins, 691 F.3d 841, 850 (6th Cir. 2012) ("the jury could credit the uncorroborated portions of Newsome's testimony describing how [defendant] solicited the kickback's over [defendant's] alternative explanation for why he accepted the money"); United States. v. Stewart, 628 F.3d 246, 255 (6th Cir. 2010) ("[e]ven the uncorroborated testimony of an accomplice may support a conviction" and "[t]he fact that the coconspirators were cooperating with the government as a result of a plea bargain does not change the result") (internal citations and quotations omitted).

The only counts remaining in Davis's sufficiency challenge are 3 (sale) and 5 (conspiracy, merged with 3), which emerged from a transaction at Kroger grocery store on October 22, 2008. Davis I, 2012 WL 1372078, at *3. Although this challenge stems in part from a dispute regarding witness credibility,[8] the TCCA ignored that aspect of the challenge to focus on another—namely,

_____

[8]     In her appellate brief, Davis argued that Goetz's identification of Davis as the person Goetz spoke with on the phone (to arrange and later confirm the transaction) was suspect because Goetz had initially testified that she could not distinguish Davis's voice from that of her co-defendant Ward. (Doc. No. 38-14, PageID# 1374–75.) The TCCA dealt with this argument in discussing the sufficiency of the evidence supporting Counts 6 and 8: "Although it is true that in discussing a

whether a rational juror could have found Davis guilty of sale despite her undisputed absence at the site of the transaction. Id. at *16. The TCCA answered that question in the affirmative:

> A sale first requires a bargained-for offer and acceptance. *Holston,* 94 S.W.3d at 510. Here, a reasonable juror could have concluded that the offer and acceptance occurred over the telephone when CI Goetz and the Defendant arranged the price and amount for the illegal drugs. Second, a sale requires actual or constructive delivery of the illegal drugs. *Id.* Based on the evidence presented, a reasonable juror could have concluded that the Defendant was acting constructively through Ward to effect the drug transaction. The Defendant told CI Goetz that Ward would meet her at Kroger to deliver the drugs. When Ward arrived, she knew the exact amount and price of the drugs and transferred them to CI Goetz. Afterwards, the Defendant verified with CI Goetz that Ward had successfully delivered the drugs and, in fact, asked whether CI Goetz needed more drugs. We conclude that this evidence was sufficient to convict the Defendant of the sale of 0.5 grams or more of cocaine.

Id. In neither her appellate brief (Doc. No. 38-14, PageID# 1374–75) nor the instant petition (Doc. No. 16, PageID# 77) does Davis explain why the inference the TCCA attributed to the jury was unreasonable. The TCCA cited state law explaining that a "constructive" delivery can support a conviction for sale of drugs and credited Goetz's testimony that Davis had arranged the sale, sent Ward to effect the transaction, and later called to confirm that the sale had been successful. Davis II, 2012 WL 1372078, at *16. The TCCA reasonably applied Jackson to show how a rational juror could have concluded that Davis was guilty of the sale of cocaine.

### 3. The TCCA's decision was not based on an unreasonable determination of fact.

Although the TCCA's sufficiency review involved an analysis of the jury's factual determinations, there is no indication that, in undertaking that analysis, the TCCA improperly recited or unreasonably determined the factual record of the trial. See Gipson v. Sheldon, 659 F.

---

previous transaction, CI Goetz stated that she had difficulty distinguishing the Defendant's voice from Ward's, she also recanted that testimony and affirmatively stated that she was familiar with Defendant's voice. Moreover, in discussing the facts of this particular transaction, CI Goetz never wavered in maintaining that she spoke with the Defendant on the telephone in arranging this drug transaction." Davis II, 2012 WL 1372078, at *17.

App'x 871, 881–82 (6th Cir. 2016) (involving a state court decision that "mistakenly stated that [a witness] identified [defendant] rather than Ricks as the individual who came to [witness's] home). Because Davis makes no reference to the reasonableness of any of the TCCA's factual references, the Court concludes that the TCCA's opinion was not based on an unreasonable determination of the facts in light of the evidence presented. 28 U.S.C. § 2254(d)(2).

### C.    Pretrial claims

Davis argues that her constitutional rights were violated prior to her trial in three ways: (1) her arrest was not supported by probable cause; (2) she was denied a preliminary hearing to determine whether there was probable cause to support her detention; and (3) after being indicted by the grand jury, she "was not arraigned on the 18 counts for which she was charged." (Doc. No. 16, PageID# 78.) Respondent again invokes the doctrine of procedural default, pointing to Davis's failure to raise these issues on direct appeal. (Doc. No. 40, PageID# 1663.) Even if Davis's claims are not procedurally defaulted, they provide no basis for habeas relief.

Davis's Fourth Amendment claim concerning the illegality of her arrest is not reviewable in this federal habeas proceeding. "A habeas petitioner may not seek habeas relief on a claim of illegal arrest if [she] had a full and fair opportunity to raise the claim in state court and presentation of the claim was not thwarted by any failure of the state's corrective processes." Machacek v. Hofbauer, 213 F.3d 947, 952 (6th Cir. 2000) (citing Stone v. Powell, 428 U.S. 465, 494–95 (1976)). This restriction on the ability of petitioners to raise Fourth Amendment claims supplements the doctrine of procedural default and presents an additional obstacle to relief. Kelley v. Jackson, 353 F. Supp. 2d 887, 893–94 (E.D. Mich. 2005). Courts presented with a Fourth Amendment claim in a federal habeas petition must determine (1) "whether the state procedural mechanism, in the abstract, presents the opportunity to raise a fourth amendment claim" and (2) "whether

presentation of the claim was in fact frustrated because of a failure of that mechanism." <u>Machacek</u>, 213 F.3d at 952 (quoting <u>Riley v. Gray</u>, 674 F.2d 522, 526 (6th Cir. 1982)). "Thus, a Fourth Amendment habeas claim may only proceed if it includes an allegation of procedural dysfunction that precluded the petitioner from fully and fairly litigating the claim in state court." <u>Miller v. Carpenter</u>, No. 3:13-CV-0610, 2014 WL 48268, at *7 (M.D. Tenn. Jan. 7, 2014).

Davis has not alleged that a failure in Tennessee procedure prevented her from litigating her illegal arrest claim in state court. Instead, Davis argues that her trial counsel "performed deficiently" by failing to object to her arrest. (Doc. No. 16, PageID# 78.) Davis then argues that counsel's failure led to a violation of due process under the Fifth and Fourteenth Amendments, as well as the Fourth Amendment's probable cause requirement. (<u>Id.</u>) Because Davis's claim is rooted in her counsel's performance and not in any procedural failure, it is not independently cognizable on federal habeas review. <u>See</u> <u>Miller</u>, 2014 WL 48268, at *8 (rejecting petitioner's Fourth Amendment habeas claim where the state court's refusal to consider the merits of that claim "resulted from trial counsel's error" rather than "a failure of the state's procedures").

Neither is Davis entitled to relief on her claim that she was "not arraigned on the 18 counts for which she was charged." (Doc. No. 16, PageID# 78.) To receive due process, a state criminal defendant must be "informed of the nature of the accusations against" her. <u>Lucas v. O'Dea</u>, 179 F.3d 412, 417 (6th Cir. 1999). But that does not mean that a state criminal defendant must be formally arraigned—"it is well established that formal arraignment is not constitutionally required if it shown that the defendant knew what [she] was accused of and is able to defend [her]self adequately." <u>Dell v. Louisiana</u>, 468 F.2d 324, 325 (5th Cir. 1972) (citing <u>Garland v. Washington</u>, 232 U.S. 642 (1914)). In other words, unless the petitioner can show that the lack of a formal arraignment caused prejudice, there is no due process violation. <u>See</u> <u>Tapia v. Tansy</u>, 926 F.2d

1554, 1558 (10th Cir. 1991); see also Archey v. Bauman, No. 15-10760, 2016 WL 107196, at *4 (E.D. Mich. Jan. 11, 2016). Finally, where the parties to a prosecution proceeded as if the "defendant had been duly arraigned," and a plea of not guilty was entered, and where the defendant did not object to the lack of arraignment, "[a] waiver ought to be conclusively implied." United States v. Lalonde, 509 F.3d 750, 757 (6th Cir. 2007) (quoting Garland, 232 U.S. at 646)).

Davis has waived her arraignment claim. She did not object to the lack of arraignment until after she was convicted, she entered a plea of not guilty, and both she and the prosecution proceeded to trial as if she had been arraigned. See Garland, 232 U.S. at 646; (Doc. No. 16, PageID# 66). But even if she had not waived this claim, she cannot show that, without a formal arraignment, she was unaware of the charges against her and therefore unable to adequately defend herself. It is worth noting (as the trial court did when confronted with this claim in Davis's petition for a writ of error coram nobis) that there is an "order of arraignment" in the record showing that Davis was arraigned on November 18, 2009, and that, at the arraignment, she waived the formal reading of the indictment and entered a plea of not guilty. (Doc. No. 38-1, PageID# 224; Doc. No. 49-6, PageID# 1716.) Even if that record is false, and Davis was not in fact arraigned, the trial transcript shows that the indictments against Davis were "read by Mr. Barnard in open court" prior to opening statements. (Doc. No. 38-4, PageID# 368.) Davis has failed to demonstrate that she was prejudiced by the State's alleged failure to formally arraign her.

Finally, Davis is not entitled to habeas relief on her claim that her due process rights were violated when she was "det[ained] without a finding of probable cause at a preliminary hearing." (Doc. No. 16, PageID# 78.) The Sixth Circuit "has repeatedly held that there is no denial of due process where a person is indicted by the Grand Jury without having a preliminary examination. There is no constitutional requirement for such an examination." United States v. Mulligan, 520

F.2d 1327, 1329–30 (6th Cir. 1975) (collecting cases). The absence of probable cause to support detention "may undermine the validity of continued pretrial detention, but not the ensuing conviction." Redmond v. Worhinton, 878 F. Supp. 2d 822, 844 (E.D. Mich. 2012). The Marshall County Grand Jury's indictment "brought formal charges against [Davis]" and was based on a finding of probable cause; it therefore "eliminated the necessity of a preliminary hearing." Mulligan, 520 F.2d at 1329.

## VI. Conclusion

In light of the foregoing, Davis's motion to amend (Doc. No. 55) and her motion for discovery (Doc. No. 48) will be denied along with this habeas corpus petition in its entirety, and this matter will be dismissed with prejudice.

The Court must issue or deny a certificate of appealability (COA) when it enters a final order denying a § 2254 petition. Rule 11(a), Rules Gov'g § 2254 Cases. Davis may not take an appeal unless the Court issues a COA. 28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1). A COA may issue only if a petitioner "has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A "substantial showing" is made with a petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner" or that the issues presented were "adequate to deserve encouragement to proceed further." Miller-El v. Cockrell, 537 U.S. 322, 336 (2003) (internal quotation omitted).

In this case, the issues raised in the petition do not merit further review. Thus, the Court will DENY a COA. Davis may, however, seek a COA directly from the United States Court of Appeals for the Sixth Circuit. Rule 11(a), Rules Gov'g § 2254 Cases.

An appropriate order is filed herewith.

WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE